ALLENTOWN MACK SALES & SERVICE, INC. *v.*
NATIONAL LABOR RELATIONS BOARD

No. 96–795.   Argued October 15, 1997—Decided January 26, 1998

SCALIA, J., delivered the opinion for a unanimous Court with respect to Part I, the opinion of the Court with respect to Part II, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined, and the opinion of the Court with respect to Parts III and IV, in which REHNQUIST, C. J., and O'CON-NOR, KENNEDY, and THOMAS, JJ., joined. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, KENNEDY, and THOMAS, JJ., joined, *post*, p. 380. BREYER, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post*, p. 388.

*Stephen D. Shawe* argued the cause for petitioner. With him on the briefs were *Earle K. Shawe* and *Eric Hemmendinger.*

*Jonathan E. Nuechterlein* argued the cause for respondent. With him on the brief were *Acting Solicitor General Dellinger, Deputy Solicitor General Wallace, Linda Sher, Norton J. Come,* and *John Emad Arbab.*\*

JUSTICE SCALIA delivered the opinion of the Court.

Under longstanding precedent of the National Labor Relations Board, an employer who believes that an incumbent union no longer enjoys the support of a majority of its employees has three options: to request a formal, Board-supervised election, to withdraw recognition from the union and refuse to bargain, or to conduct an internal poll of employee support for the union. The Board has held that the latter two are unfair labor practices unless the employer can show that it had a "good-faith reasonable doubt" about the union's majority support. We must decide whether the Board's standard for employer polling is rational and consistent with the National Labor Relations Act, and whether the Board's factual determinations in this case are supported by substantial evidence in the record.

I

Mack Trucks, Inc., had a factory branch in Allentown, Pennsylvania, whose service and parts employees were represented by Local Lodge 724 of the International Association

---

\*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *John S. Irving, Christopher Landau, Stephen A. Bokat, Robin S. Conrad,* and *Mona C. Zeiberg;* for the American Trucking Associations, Inc., by *James D. Holzhauer, Timothy S. Bishop,* and *Daniel R. Barney;* and for the Labor Policy Association by *Robert E. Williams* and *Daniel V. Yager.*

*Laurence Gold, Jonathan P. Hiatt,* and *Marsha S. Berzon* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

of Machinists and Aerospace Workers, AFL–CIO (Local 724). Mack notified its Allentown managers in May 1990 that it intended to sell the branch, and several of those managers formed Allentown Mack Sales & Service, Inc., the petitioner here, which purchased the assets of the business on December 20, 1990, and began to operate it as an independent dealership. From December 21, 1990, to January 1, 1991, Allentown hired 32 of the original 45 Mack employees.

During the period before and immediately after the sale, a number of Mack employees made statements to the prospective owners of Allentown Mack Sales suggesting that the incumbent union had lost support among employees in the bargaining unit. In job interviews, eight employees made statements indicating, or at least arguably indicating, that they personally no longer supported the union. In addition, Ron Mohr, a member of the union's bargaining committee and shop steward for the Mack Trucks service department, told an Allentown manager that it was his feeling that the employees did not want a union, and that "with a new company, if a vote was taken, the Union would lose." 316 N. L. R. B. 1199, 1207 (1995). And Kermit Bloch, who worked for Mack Trucks as a mechanic on the night shift, told a manager that the entire night shift (then five or six employees) did not want the union.

On January 2, 1991, Local 724 asked Allentown Mack Sales to recognize it as the employees' collective-bargaining representative, and to begin negotiations for a contract. The new employer rejected that request by letter dated January 25, claiming a "good faith doubt as to support of the Union among the employees." *Id.*, at 1205. The letter also announced that Allentown had "arranged for an independent poll by secret ballot of its hourly employees to be conducted under guidelines prescribed by the National Labor Relations Board." *Ibid.* The poll, supervised by a Roman Catholic priest, was conducted on February 8, 1991; the union lost 19

to 13. Shortly thereafter, the union filed an unfair-labor-practice charge with the Board.

The Administrative Law Judge (ALJ) concluded that Allentown was a "successor" employer to Mack Trucks, Inc., and therefore inherited Mack's bargaining obligation and a presumption of continuing majority support for the union. *Id.*, at 1203. The ALJ held that Allentown's poll was conducted in compliance with the procedural standards enunciated by the Board in *Struksnes Constr. Co.*, 165 N. L. R. B. 1062 (1967), but that it violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (Act), 49 Stat. 452, as amended, 29 U. S. C. §§ 158(a)(1) and 158(a)(5), because Allentown did not have an "objective reasonable doubt" about the majority status of the union. The Board adopted the ALJ's findings and agreed with his conclusion that Allentown "had not demonstrated that it harbored a reasonable doubt, based on objective considerations, as to the incumbent Union's continued majority status after the transition." 316 N. L. R. B., at 1199. The Board ordered Allentown to recognize and bargain with Local 724.

On review in the Court of Appeals for the District of Columbia Circuit, Allentown challenged both the facial rationality of the Board's test for employer polling and the Board's application of that standard to the facts of this case. The court enforced the Board's bargaining order, over a vigorous dissent. 83 F. 3d 1483 (1996). We granted certiorari. 520 U. S. 1103 (1997).

II

Allentown challenges the Board's decision in this case on several grounds. First, it contends that because the Board's "reasonable doubt" standard for employer polls is the same as its standard for unilateral withdrawal of recognition and for employer initiation of a Board-supervised election (a so-called "Representation Management," or "RM," election), the Board irrationally permits employers to poll only when it would be unnecessary and legally pointless to do so. Sec-

ond, Allentown argues that the record evidence clearly demonstrates that it had a good-faith reasonable doubt about the union's claim to majority support. Finally, it asserts that the Board has, *sub silentio* (and presumably in violation of law), abandoned the "reasonable doubt" prong of its polling standard, and recognizes an employer's "reasonable doubt" only if a majority of the unit employees renounce the union. In this Part of our opinion we address the first of these challenges; the other two, which are conceptually intertwined, will be addressed in Parts III and IV.

Courts must defer to the requirements imposed by the Board if they are "rational and consistent with the Act," *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S. 27, 42 (1987), and if the Board's "explication is not inadequate, irrational or arbitrary," *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963). Allentown argues that it is irrational to require the same factual showing to justify a poll as to justify an outright withdrawal of recognition, because that leaves the employer with no legal incentive to poll. Under the Board's framework, the results of a poll can never supply an otherwise lacking "good-faith reasonable doubt" necessary to justify a withdrawal of recognition, since the employer must already have that same reasonable doubt before he is permitted to conduct a poll. Three Courts of Appeals have found that argument persuasive. *NLRB* v. *A. W. Thompson, Inc.*, 651 F. 2d 1141, 1144 (CA5 1981); see also *Mingtree Restaurant, Inc.* v. *NLRB*, 736 F. 2d 1295 (CA9 1984); *Thomas Industries, Inc.* v. *NLRB*, 687 F. 2d 863 (CA6 1982).

While the Board's adoption of a unitary standard for polling, RM elections, and withdrawals of recognition is in some respects a puzzling policy, we do not find it so irrational as to be "arbitrary [or] capricious" within the meaning of the Administrative Procedure Act, 5 U. S. C. §706. The Board believes that employer polling is potentially "disruptive" to established bargaining relationships and "unsettling" to employees, and so has chosen to limit severely the circum-

stances under which it may be conducted. *Texas Petro-chemicals Corp.*, 296 N. L. R. B. 1057, 1061 (1989), enf'd as modified, 923 F. 2d 398 (CA5 1991). The unitary standard reflects the Board's apparent conclusion that polling should be tolerated only when the employer might otherwise simply withdraw recognition and refuse to bargain.

It is true enough that this makes polling useless as a means of insulating a contemplated withdrawal of recognition against an unfair-labor-practice charge—but there is more to life (and even to business) than escaping unfair-labor-practice findings. An employer concerned with good employee relations might recognize that abrupt withdrawal of recognition—even from a union that no longer has major-ity support—will certainly antagonize union supporters, and perhaps even alienate employees who are on the fence. Preceding that action with a careful, unbiased poll can pre-vent these consequences. The "polls are useless" argument falsely assumes, moreover, that every employer will *want* to withdraw recognition as soon as he has enough evidence of lack of union support to defend against an unfair-labor-practice charge. It seems to us that an employer whose evi-dence met the "good-faith reasonable doubt" standard might nonetheless want to withdraw recognition only if he had con-clusive evidence that the union *in fact* lacked majority sup-port, lest he go through the time and expense of an (ulti-mately victorious) unfair-labor-practice suit for a benefit that will only last until the next election. See *Texas Petrochemi-cals, supra*, at 1063. And finally, it is probably the case that, though the standard for conviction of an unfair labor practice with regard to polling is identical to the standard with re-gard to withdrawal of recognition, the chance that a charge will be filed is significantly less with regard to the polling, particularly if the union wins.

It must be acknowledged that the Board's avowed prefer-ence for RM elections over polls fits uncomfortably with its unitary standard; as the Court of Appeals pointed out, that

preference should logically produce a more rigorous standard for polling. 83 F. 3d, at 1487. But there are other reasons why the standard for polling ought to be *less* rigorous than the standard for Board elections. For one thing, the consequences of an election are more severe: If the union loses an employer poll it can still request a Board election, but if the union loses a formal election it is barred from seeking another for a year. See 29 U. S. C. § 159(c)(3). If it would be rational for the Board to set the polling standard either higher or lower than the threshold for an RM election, then surely it is not irrational for the Board to split the difference.

### III

The Board held Allentown guilty of an unfair labor practice in its conduct of the polling because it "ha[d] not demonstrated that it held a reasonable doubt, based on objective considerations, that the Union continued to enjoy the support of a majority of the bargaining unit employees." 316 N. L. R. B., at 1199. We must decide whether that conclusion is supported by substantial evidence on the record as a whole. *Fall River Dyeing, supra,* at 42; *Universal Camera Corp. v. NLRB,* 340 U. S. 474 (1951).[1] Put differently, we must decide whether on this record it would have been pos-

---

[1] JUSTICE BREYER's opinion asserts that this issue is not included within the question presented by the petition. *Post,* at 388 (opinion concurring in part and dissenting in part). The question reads: "Whether the National Labor Relations Board erred in holding that a successor employer cannot conduct a poll to determine whether a majority of its employees support a union unless it already has obtained so much evidence of no majority support as to render the poll meaningless." Pet. for Cert. i. The phrase "so much . . . as to render the poll meaningless" is of course conclusory and argumentative. Fairly read, the question asks whether the Board erred by requiring *too much* evidence of majority support. That question can be answered in the affirmative if either (1) the Board's polling standard is irrational or inconsistent with the Act, or (2) the Board erroneously found that the evidence in this case was insufficient to meet that standard.

sible for a reasonable jury to reach the Board's conclusion. See, *e. g., NLRB* v. *Columbian Enameling & Stamping Co.,* 306 U. S. 292, 300 (1939); *Consolidated Edison Co.* v. *NLRB,* 305 U. S. 197, 229 (1938).

Before turning to that issue, we must clear up some semantic confusion. The Board asserted at argument that the word "doubt" may mean either "uncertainty" or "disbelief," and that its polling standard uses the word only in the latter sense. We cannot accept that linguistic revisionism. "Doubt" is precisely that sort of "disbelief" (failure to believe) which consists of an uncertainty rather than a belief in the opposite. If the subject at issue were the existence of God, for example, "doubt" would be the disbelief of the agnostic, not of the atheist. A doubt is an uncertain, tentative, or provisional disbelief. See, *e. g.,* Webster's New International Dictionary 776 (2d ed. 1949) (def. 1: "A fluctuation of mind arising from defect of knowledge or evidence; uncertainty of judgment or mind; unsettled state of opinion concerning the reality of an event, or the truth of an assertion, etc."); 1 The New Shorter Oxford English Dictionary 734 (1993) (def. 1: "Uncertainty as to the truth or reality of something or as to the wisdom of a course of action; occasion or room for uncertainty"); American Heritage Dictionary 555 (3d ed. 1992) (def. 1: "A lack of certainty that often leads to irresolution").

The question presented for review, therefore, is whether, on the evidence presented to the Board, a reasonable jury could have found that Allentown lacked a genuine, reasonable uncertainty about whether Local 724 enjoyed the continuing support of a majority of unit employees.[2] In our

---

[2] JUSTICE BREYER suggests that we have focused on the wrong words, and that the explanation for the Board's holding here is not that portion of its polling standard which requires "reasonable doubt" but that which requires the doubt to be "based on objective considerations." The Board has not stressed the word "objective" in its brief or argument, for the very

view, the answer is no. The Board's finding to the contrary rests on a refusal to credit probative circumstantial evidence, and on evidentiary demands that go beyond the substantive standard the Board purports to apply.

The Board adopted the ALJ's finding that 6 of Allentown's 32 employees had made "statements which could be used as objective considerations supporting a good-faith reasonable doubt as to continued majority status by the Union." 316 N. L. R. B., at 1207. (These included, for example, the statement of Rusty Hoffman that "he did not want to work in a union shop," and "would try to find another job if he had to work with the Union." *Id.*, at 1206.) The Board seemingly also accepted (though this is not essential to our analysis) the ALJ's willingness to assume that the statement of a seventh employee (to the effect that he "did not feel comfortable with the Union and thought it was a waste of $35 a month," *ibid.*) supported good-faith reasonable doubt of his support for the union—as in our view it unquestionably does. And it presumably accepted the ALJ's assessment that "7 of 32, or roughly 20 percent of the involved employees" was not alone sufficient to create "an objective reasonable doubt of union majority support," *id.*, at 1207. The Board did not specify

---

good reason that the meaning of the word has nothing to do with the *force,* as opposed to the *source,* of the considerations supporting the employer's doubt. See Webster's New International Dictionary 1679 (2d ed. 1949) (def. 2: "Emphasizing or expressing the nature of reality as it is apart from self-consciousness"). Requiring the employer's doubt to be based on "objective" considerations reinforces the requirement that the doubt be "reasonable," imposing on the employer the burden of showing that it was supported by evidence external to the employer's own *(subjective)* impressions. JUSTICE BREYER asserts, instead, that the word "objective" has been redefined through a series of Board decisions ignoring its real meaning, so that it now means something like "exceedingly reliable." As we shall discuss in Part IV, the Board is entitled to create higher standards of evidentiary proof by rule, or even by explicit announcement in adjudication (assuming adequate warning); but when the Board simply repeatedly finds evidence not "objective" that is so, its decisions have no permanent deleterious effect upon the English language.

how many express disavowals would have been enough to establish reasonable doubt, but the number must presumably be less than 16 (half of the bargaining unit), since that would establish reasonable *certainty*. Still, we would not say that 20% first-hand-confirmed opposition (even with no countering evidence of union support) is alone enough to *require* a conclusion of reasonable doubt. But there was much more.

For one thing, the ALJ and the Board totally disregarded the effect upon Allentown of the statement of an eighth employee, Dennis Marsh, who said that "he was not being represented for the $35 he was paying." *Ibid.* The ALJ, whose findings were adopted by the Board, said that this statement "seems more an expression of a desire for better representation than one for no representation at all." *Ibid.* It seems to us that it is, more accurately, simply an expression of dissatisfaction with the union's performance—which *could* reflect the speaker's desire that the union represent him more effectively, but *could also* reflect the speaker's desire to save his $35 and get rid of the union. The statement would assuredly engender an *uncertainty* whether the speaker supported the union, and so could not be entirely ignored.

But the most significant evidence excluded from consideration by the Board consisted of statements of two employees regarding not merely their own support of the union, but support among the work force in general. Kermit Bloch, who worked on the night shift, told an Allentown manager that "the entire night shift did not want the Union." *Ibid.* The ALJ refused to credit this, because "Bloch did not testify and thus could not explain how he formed his opinion about the views of his fellow employees." *Ibid.* Unsubstantiated assertions that other employees do not support the union certainly do not establish *the fact of that disfavor* with the degree of reliability ordinarily demanded in legal proceedings. But under the Board's enunciated test for polling, it is not the fact of disfavor that is at issue (the poll itself is meant to establish that), but rather the existence of a reason-

able uncertainty on the part of the employer regarding that fact. On that issue, absent some reason for the employer to know that Bloch had no basis for his information, or that Bloch was lying, reason demands that the statement be given considerable weight.

Another employee who gave information concerning overall support for the union was Ron Mohr, who told Allentown managers that "if a vote was taken, the Union would lose" and that "it was his feeling that the employees did not want a union." *Ibid.* The ALJ again objected irrelevantly that "there is no evidence with respect to how he gained this knowledge." *Id.,* at 1208. In addition, the Board held that Allentown "could not legitimately rely on [the statement] as a basis for doubting the Union's majority status," *id.,* at 1200, because Mohr was "referring to Mack's existing employee complement, not to the individuals who were later hired by [Allentown]," *ibid.* This basis for disregarding Mohr's statements is wholly irrational.[3] Local 724 had never won an election, or even an informal poll, within the actual unit of 32 Allentown employees. Its claim to represent them rested entirely on the Board's presumption that the work force of a successor company has the same disposition regarding the union as did the work force of the predecessor company, if the majority of the new work force came from the old one. See *id.,* at 1197, n. 3; *Fall River Dyeing,* 482 U. S., at 43, 46–52. The Board cannot rationally adopt that presumption for purposes of imposing the duty to bargain, and adopt precisely the opposite presumption (*i. e.,* contend that there is no relationship between the sentiments of the two work forces) for purposes of determining what evidence tends to establish a reasonable doubt regarding union support. Such

---

[3] JUSTICE BREYER points out that the ALJ did not disregard Mohr's statement entirely, but merely found that it was insufficient to establish a good-faith reasonable doubt. That observation is accurate but irrelevant. The Board discussed Mohr's statement in its own opinion, and the language quoted above makes it clear that the Board gave it no weight at all.

irrationality is impermissible even if, as JUSTICE BREYER suggests, it would further the Board's political objectives.

It must be borne in mind that the issue here is not whether Mohr's statement clearly establishes a majority in opposition to the union, but whether it contributes to a reasonable uncertainty whether a majority in favor of the union existed. We think it surely does. Allentown would reasonably have given great credence to Mohr's assertion of lack of union support, since he was not hostile to the union, and was in a good position to assess antiunion sentiment. Mohr was a union shop steward for the service department, and a member of the union's bargaining committee; according to the ALJ, he "did not indicate personal dissatisfaction with the Union." 316 N. L. R. B., at 1208. It seems to us that Mohr's statement has undeniable and substantial probative value on the issue of "reasonable doubt."

Accepting the Board's apparent (and in our view inescapable) concession that Allentown received reliable information that 7 of the bargaining-unit employees did not support the union, the remaining 25 would have had to support the union by a margin of 17 to 8—a ratio of more than 2 to 1—if the union commanded majority support. The statements of Bloch and Mohr would cause anyone to doubt that degree of support, and neither the Board nor the ALJ discussed any evidence that Allentown should have weighed on the other side. The most pro-union statement cited in the ALJ's opinion was Ron Mohr's comment that he personally "could work with or without the Union," and "was there to do his job." *Id.*, at 1207. The Board cannot covertly transform its presumption of continuing majority support into a working assumption that *all* of a successor's employees support the union until proved otherwise. Giving fair weight to Allentown's circumstantial evidence, we think it quite impossible for a rational factfinder to avoid the conclusion that Allentown had reasonable, good-faith grounds to doubt—to be *uncertain about*—the union's retention of majority support.

## IV

That conclusion would make this a fairly straightforward administrative-law case, except for the contention that the Board's factfinding here was not an aberration. Allentown asserts that, although "the Board continues to cite the words of the good faith doubt branch of its withdrawal of recognition standard," a systematic review of the Board's decisions will reveal that "it has in practice eliminated the good faith doubt branch in favor of a strict head count." Brief for Petitioner 10. The Board denies (not too persuasively) that it has insisted upon a strict head count,[4] but does defend its factfinding in this case by saying that it has regularly rejected similarly persuasive demonstrations of reasonable good-faith doubt in prior decisions. The Court of Appeals in fact accepted that defense, relying on those earlier, similar decisions to conclude that the Board's findings were supported by substantial evidence here. See 83 F. 3d, at 1488. That the current decision may conform to a long pattern is also suggested by academic commentary. One scholar, after conducting "[a] thorough review of the withdrawal of recognition case law," concluded:

"[C]ircumstantial evidence, no matter how abundant, is rarely, if ever, enough to satisfy the good-faith doubt test. In practice, the Board deems the test satisfied only if the employer has proven that a majority of the bargaining unit has expressly repudiated the union. Such direct evidence, however, is nearly impossible to gather lawfully. Thus, the Board's good-faith doubt

---

[4] The Board cited in its brief a number of cases in which it found circumstantial evidence sufficient to support a "good-faith reasonable doubt." See Brief for Respondent 31–32, n. 8. Those cases do indeed reveal a genuine interest in circumstantial evidence, but the most recent of them, *J & J Drainage Products Co.*, 269 N. L. R. B. 1163 (1984), was decided more than a decade ago. Allentown contends that the Board has *abandoned* the good-faith-doubt test, not that it never existed.

standard, although ostensibly a highly fact-dependent totality-of-the-circumstances test, approaches a *per se* rule in application . . . ." Flynn, The Costs and Benefits of "Hiding the Ball": NLRB Policymaking and the Failure of Judicial Review, 75 B. U. L. Rev. 387, 394–395 (1995) (footnotes omitted).

See also Weeks, The Union's Mid-Contract Loss of Majority Support: A Waivering Presumption, 20 Wake Forest L. Rev. 883, 889 (1984). Members of this Court have observed the same phenomenon. See *NLRB* v. *Curtin Matheson Scientific, Inc.*, 494 U. S. 775, 797 (1990) (REHNQUIST, C. J., concurring) ("[S]ome recent decisions suggest that [the Board] now requires an employer to show that individual employees have 'expressed desires' to repudiate the incumbent union in order to establish a reasonable doubt of the union's majority status"); *id.*, at 799 (Blackmun, J., dissenting) ("[T]he Board appears to require that good-faith doubt be established by express avowals of individual employees").

It is certainly conceivable that an adjudicating agency might consistently require a particular substantive standard to be established by a quantity or character of evidence so far beyond what reason and logic would require as to make it apparent that the *announced* standard is not *really* the effective one. And it is conceivable that in certain categories of cases an adjudicating agency which purports to be applying a preponderance standard of proof might so consistently demand in fact more than a preponderance, that all should be on notice from its case law that the genuine burden of proof is more than a preponderance. The question arises, then, whether, if that should be the situation that obtains here, we ought to measure the evidentiary support for the Board's decision against the standards consistently applied rather than the standards recited. As a theoretical matter (and leaving aside the question of legal authority), the Board could certainly have raised the bar for employer polling or

withdrawal of recognition by imposing a more stringent requirement than the reasonable-doubt test, or by adopting a formal requirement that employers establish their reasonable doubt by more than a preponderance of the evidence. Would it make any difference if the Board achieved precisely the same result by formally leaving in place the reasonable-doubt and preponderance standards, but consistently applying them as though they meant something other than what they say? We think it would.

The Administrative Procedure Act, which governs the proceedings of administrative agencies and related judicial review, establishes a scheme of "reasoned decisionmaking." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 52 (1983). Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational. Courts enforce this principle with regularity when they set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce. See *SEC v. Chenery Corp.*, 318 U. S. 80 (1943); *SEC v. Chenery Corp.*, 332 U. S. 194 (1947). The National Labor Relations Board, uniquely among major federal administrative agencies, has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking. See, *e. g.*, *NLRB v. Bell Aerospace Co.*, 416 U. S. 267, 294–295 (1974). (To our knowledge, only one regulation has ever been adopted by the Board, dealing with the appropriate size of bargaining units in the health care industry. See 29 CFR § 103.30 (1997).) But adjudication is subject to the requirement of reasoned decisionmaking as well. It is hard to imagine a more violent breach of that requirement than applying a rule of primary conduct or a standard of proof which is in fact different from the rule or standard formally announced. And the consistent repetition of that breach can hardly mend it.

Reasoned decisionmaking, in which the rule announced is the rule applied, promotes sound results, and unreasoned decisionmaking the opposite. The evil of a decision that applies a standard other than the one it enunciates spreads in both directions, preventing both consistent application of the law by subordinate agency personnel (notably ALJ's), and effective review of the law by the courts. These consequences are well exemplified by a recent withdrawal-of-recognition case in which the Board explicitly reaffirmed its adherence to the preponderance-of-the-evidence standard. One of the Board's ALJ's, interpreting the agency's prior cases as many others have, had concluded that the Board in fact required " 'clear, cogent, and convincing' " evidence that the union no longer commanded a majority. *Laidlaw Waste Systems, Inc.*, 307 N. L. R. B. 1211 (1992). On review the Board rejected that standard, insisting that "in order to rebut the presumption of an incumbent union's majority status, an employer must show by a preponderance of the evidence . . . objective factors sufficient to support a reasonable and good-faith doubt of the union's majority." *Ibid.* So far, so good. The Board then went on to add, however, that "[t]his is not to say that the terms 'clear, cogent, and convincing' have no significance at all in withdrawal of recognition cases." *Ibid.* It then proceeded to make the waters impenetrably muddy with the following:

> "It is fair to say that the Board will not find that an employer has supported its defense by a preponderance of the evidence if the employee statements and conduct relied on are not clear and cogent rejections of the union as a bargaining agent, i. e., are simply not convincing manifestations, taken as a whole, of a loss of majority support. The opposite of 'clear, cogent, and convincing' evidence in this regard might be fairly described as 'speculative, conjectural, and vague'—evidence that plainly does not meet the preponderance-of-the-evidence burden of proof." *Id.*, at 1211–1212.

Each sentence of this explanation is nonsense, and the two sentences together are not even compatibly nonsensical. "Preponderance of the evidence" and "clear and convincing evidence" describe well known, contrasting standards of proof. To say, as the first sentence does, that a preponderance standard demands "clear and convincing manifestations, taken as a whole" is to convert that standard into a higher one; and to say, as the second sentence does, that whatever is not "speculative, conjectural, and vague" meets the "clear, cogent, and convincing" standard is to reconvert that standard into a lower one. And the offsetting errors do not produce rationality but compounded confusion. If the Board's application of the preponderance standard is indeed accurately described by this passage, it is hard for the ALJ to know what to do with the next case.

A case like *Laidlaw*, or a series of cases that exemplify in practice its divorcing of the rule announced from the rule applied, also frustrates judicial review. If revision of the Board's standard of proof can be achieved thus subtly and obliquely, it becomes a much more complicated enterprise for a court of appeals to determine whether substantial evidence supports the conclusion that the required standard has or has not been met. It also becomes difficult for this Court to know, when certiorari is sought, whether the case involves the generally applicable issue of the Board's adoption of an unusually high standard of proof, or rather just the issue of an allegedly mistaken evidentiary judgment in the particular case. An agency should not be able to impede judicial review, and indeed even political oversight, by disguising its policymaking as factfinding.

Because reasoned decisionmaking demands it, and because the systemic consequences of any other approach are unacceptable, the Board must be required to apply in fact the clearly understood legal standards that it enunciates in principle, such as good-faith reasonable doubt and preponderance of the evidence. Reviewing courts are entitled to

take those standards to mean what they say, and to conduct substantial-evidence review on that basis. Even the most consistent and hence predictable Board departure from proper application of those standards will not alter the legal rule by which the agency's factfinding is to be judged.

That principle is not, as JUSTICE BREYER suggests, inconsistent with our decisions according "substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ.* v. *Shalala,* 512 U. S. 504, 512 (1994). Substantive review of an agency's interpretation of its regulations is governed only by that general provision of the Administrative Procedure Act which requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U. S. C. § 706(2)(A). It falls well within this text to give the agency the benefit of the doubt as to the meaning of its regulation. On-the-record agency factfinding, however, is also governed by a provision that requires the agency action to be set aside if it is "unsupported by substantial evidence," § 706(2)(E)—which is the very specific requirement at issue here. See also 29 U. S. C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive"). The "substantial evidence" test *itself* already gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder. See *Columbian Enameling & Stamping Co.,* 306 U. S., at 300. This is an objective test, and there is no room within it for deference to an agency's eccentric view of what a reasonable factfinder *ought* to demand. We do not, moreover (we could not possibly), search to find revisions of the agency's rules—revisions of the requisite fact that the adjudication is supposed to determine—hidden in the agency's factual findings. In the regime envisioned by JUSTICE BREYER—a regime in which inadequate

factual findings become simply a revision of the standard that the Board's (adjudicatorily adopted) rules set forth, thereby converting those findings into rule interpretations to which judges must defer—the "substantial evidence" factual review provision of the Administrative Procedure Act becomes a nullity.

The Board can, of course, forthrightly and explicitly adopt counterfactual evidentiary presumptions (which are in effect substantive rules of law) as a way of furthering particular legal or policy goals—for example, the Board's irrebuttable presumption of majority support for the union during the year following certification, see, e. g., *Station KKHI*, 284 N. L. R. B. 1339, 1340 (1987), enf'd, 891 F. 2d 230 (CA9 1989). The Board might also be justified in forthrightly and explicitly adopting a rule of evidence that categorically excludes certain testimony on policy grounds, without reference to its inherent probative value. (Such clearly announced rules of law or of evidentiary exclusion would of course be subject to judicial review for their reasonableness and their compatibility with the Act.) That is not the sort of Board action at issue here, however, but rather the Board's allegedly systematic undervaluation of certain evidence, or allegedly systematic exaggeration of what the evidence must prove. See, e. g., *Westbrook Bowl*, 293 N. L. R. B. 1000, 1001, n. 11 (1989) ("The Board has stated that 'testimony concerning conversations directly with the employees involved . . . is much more reliable than testimony concerning merely a few employees ostensibly conveying the sentiments of their fellows'"), quoting *Sofco, Inc.*, 268 N. L. R. B. 159, 160, n. 10 (1983). When the Board purports to be engaged in simple factfinding, unconstrained by substantive presumptions or evidentiary rules of exclusion, it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands. "Substantial evidence" review exists precisely to ensure that the Board achieves minimal compliance with this obliga-

tion, which is the foundation of all honest and legitimate adjudication.

For the foregoing reasons, we need not determine whether the Board has consistently rejected or discounted probative evidence so as to cause "good-faith reasonable doubt" or "preponderance of the evidence" to mean something more than what the terms connote. The line of precedents relied on by the ALJ and the Court of Appeals could not render irrelevant to the Board's decision, and hence to our review, any evidence that tends to establish the existence of a good-faith reasonable doubt. It was therefore error, for example, for the ALJ to discount Ron Mohr's opinion about lack of union support because of "the Board's historical treatment of unverified assertions by an employee about another employee's sentiments." 316 N. L. R. B., at 1208. And it was error for the Court of Appeals to rely upon the fact that "[t]he Board has consistently questioned the reliability of reports by one employee of the antipathy of other employees toward their union." 83 F. 3d, at 1488, citing *Westbrook Bowl, supra,* at 1001, n. 11; *Sofco, Inc., supra,* at 160, n. 10. Assuming that those assessments of the Board's prior behavior are true, they nonetheless provide no justification for the Board's factual inferences here. Of course, the Board is entitled to be skeptical about the employer's claimed reliance on secondhand reports when the reporter has little basis for knowledge, or has some incentive to mislead. But that is a matter of logic and sound inference from all the circumstances, not an arbitrary rule of disregard to be extracted from prior Board decisions.

The same is true of the Board precedents holding that "an employee's statements of dissatisfaction with the quality of union representation may not be treated as opposition to union representation," and that "an employer may not rely on an employee's anti-union sentiments, expressed during a job interview in which the employer has indicated that there will be no union." 83 F. 3d, at 1488, citing *Destileria Ser-*

*ralles, Inc.*, 289 N. L. R. B. 51 (1988), enf'd, 882 F. 2d 19 (CA1 1989), and *Middleboro Fire Apparatus, Inc.*, 234 N. L. R. B. 888, 894, enf'd, 590 F. 2d 4 (CA1 1978). It is of course true that such statements are not clear evidence of an employee's opinion about the union—and if the Board's substantive standard required clear proof of employee disaffection, it might be proper to ignore such statements altogether. But that is not the standard, and, depending on the circumstances, the statements can unquestionably be probative to some degree of the employer's good-faith reasonable doubt.

\* \* \*

We conclude that the Board's "reasonable doubt" test for employer polls is facially rational and consistent with the Act. But the Board's factual finding that Allentown Mack Sales lacked such a doubt is not supported by substantial evidence on the record as a whole. The judgment of the Court of Appeals for the District of Columbia Circuit is therefore reversed, and the case is remanded with instructions to deny enforcement.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR, JUSTICE KENNEDY, and JUSTICE THOMAS join, concurring in part and dissenting in part.

I concur in the judgment of the Court and in Parts I, III, and IV. However, I disagree that the National Labor Relations Board's standard is rational and consistent with the National Labor Relations Act, and I therefore dissent as to Part II.

The Board's standard for employer polls requires a showing of reasonable doubt, based on sufficient objective considerations, that the union continues to enjoy majority support. *Texas Petrochemicals Corp.*, 296 N. L. R. B. 1057, 1061 (1989), enf'd as modified, 923 F. 2d 398 (CA5 1991); *Auciello Iron Works, Inc.* v. *NLRB*, 517 U. S. 781, 786–787 (1996);

*NLRB* v. *Curtin Matheson Scientific, Inc.*, 494 U. S. 775, 778 (1990). While simply stated, what this rule means in practice is harder to pin down. As suggested by the Court's opinion, *ante*, at 371–373, despite its billing as a "good-faith reasonable doubt" standard, this test appears to be quite rigorous. The Board so concedes: "It is true that the Board's 'reasonable doubt' standard is sufficiently rigorous and fact-specific that employers often cannot be certain in advance whether their evidentiary basis either for taking a poll or for withdrawing recognition will ultimately be deemed to have met that standard." Brief for Respondent 38.

The Board's standard is sufficiently stringent so as to exclude most circumstantial evidence (and quite a bit of direct evidence) from consideration and therefore to preclude polling except in extremely limited circumstances—ironically, those in which a poll has almost no practical value. It requires as a prerequisite to questioning a union's majority support that the employer have information that it is forbidden to obtain by the most effective method. See *Curtin Matheson, supra*, at 797 (REHNQUIST, C. J., concurring) ("I have considerable doubt whether the Board may insist that good-faith doubt be determined only on the basis of sentiments of individual employees, and at the same time bar the employer from using what might be the only effective means of determining those sentiments"); 494 U. S., at 799, and n. 3 (Blackmun, J., dissenting). The Board's argument that polls are still valuable in ensuring that the union lacks majority support *in fact*, effectively concedes that polls will have only extremely limited scope. The Board's standard also leaves little practical value for employers in polling, since a losing union can *ex post* challenge a poll on the same grounds as a withdrawal of recognition, as happened here.

The Board argues first that its employer polling standard is authorized by, and consistent with, the Act because it promotes the overriding goal of industrial peace. Polling purportedly threatens industrial peace because it "raises si-

multaneously a challenge to the union in its role as representative and a doubt in the mind of an employee as to the union's status as his bargaining representative." *Texas Petrochemicals, supra*, at 1061–1062; Brief for Respondent 27. This threatened disruption to the stability of the bargaining relationship and the unsettling effect on employees, it is argued, impair employee rights to bargain collectively. The Board also asserts that its employer polling standard may be the same as the standard for unilateral withdrawals of recognition, and yet be rational, because it still allows the employer to use polls to confirm a loss of majority support for the union before withdrawal of recognition. And the same standard for Representative Management (RM) elections is valid, the Board claims, because RM elections and polling have common practical and legal consequences. See *Texas Petrochemicals, supra*, at 1060; Brief for Respondent 36–37, n. 12.

I think the Board's reasoning comes up short on two counts. First, there is no support in the language of the Act for its treatment of polling, and second, its treatment of polling even apart from the statute is irrational.

The Act does not address employer polling. The Board's authority to regulate employer polling at all must therefore rest on its power to prohibit any practices that "interfere with, restrain, or coerce employees in the exercise" of their right to bargain collectively under § 8(a)(1), 29 U. S. C. § 158(a)(1).[1] The Board fails to demonstrate how employer polling, conducted in accord with procedural safeguards and with no overt coercion or threats of reprisal, violates

---

[1] The Board argues in the alternative that its standard is authorized by § 8(a)(5), even though a violation of that section was not alleged in this case. But the Board provides no explanation as to how the authority it is granted or the protection extended employees under § 8(a)(5) differs from that of § 8(a)(1). Section 8(a)(5) states: "It shall be an unfair labor practice for an employer—(5) to refuse to bargain collectively with the representatives of his employees . . . ." 29 U. S. C. § 158(a)(5).

the terms of the Act. Such polling does not directly restrain employees' rights to bargain collectively or affect the collective-bargaining relationship. If the union loses the poll, its status as collective-bargaining representative would certainly be affected, but that outcome is not necessarily one the Act prevents. That a poll may raise "doubts" in the minds of employees as to the union's support would not appear to interfere with employees' rights, particularly since a poll is permissible only once the presumption of majority support becomes rebuttable. See *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S. 27, 37–38 (1987) (recognizing the nonrebuttable presumption of majority support for one year after certification). And such "doubts" hardly appear so unsettling for employees or so disruptive of the bargaining relationship as to warrant severe restrictions on polling.

A poll conducted in accord with the Board's substantial procedural safeguards would not coerce employees in the exercise of their rights. In *Struksnes Constr. Co.*, 165 N. L. R. B. 1062, 1063 (1967), the Board, in addressing the validity of an employer poll during a union's organizing drive, held that polling does not violate the Act if "(1) the purpose of the poll is to determine the truth of the union's claim to majority, (2) this purpose is communicated to employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot, and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere." In *Texas Petrochemicals*, 296 N. L. R. B., at 1063–1064, the Board imposed an additional requirement of advance notice of the time and place of the poll. These substantial safeguards make coercion or restraint of employees highly unlikely.[2]

---

[2] The Board contends the *Struksnes* standard is not appropriate where the union is already established and enjoys a presumption of majority support, as opposed to the organizing phase where the union must establish its majority support. Brief for Respondent 28. But the safeguards

Additionally, the Board's rationale gives short shrift to the Act's goal of protecting employee choice. *Auciello Iron Works,* 517 U. S., at 790–791. By ascertaining employee support for the union, a poll indirectly promotes this goal. Employees are not properly represented by a union lacking majority support. Employers also have a legitimate, recognized interest in not bargaining with a union lacking majority support. *Texas Petrochemicals, supra,* at 1062. The ability to poll employees thus provides the employer (and the employees) with a neutral and effective manner of obtaining information relevant to determining the employees' proper representative and the employer's bargaining obligations. See *Curtin Matheson,* 494 U. S., at 797 (REHNQUIST, C. J., concurring); see also *id.,* at 799 (Blackmun, J., concurring). Stability, while an important goal of the Act, see *Fall River, supra,* at 37, is not its be-all and end-all. That goal would not justify, for example, allowing a nonmajority union to remain in place (after a certification or contract bar has expired) simply by denying employers any effective means of ascertaining employee views. I conclude that the Board's standard restricts polling in the absence of coercion or restraint of employee rights and therefore is contrary to the Act.

Quite apart from the lack of statutory authority for the Board's treatment of polling, I think this treatment irrationally equates employer polls, RM elections, and unilateral withdrawals of recognition. The Board argues that having

protect against the potentially disruptive or coercive effects of polls equally in both situations. If anything, polling would seem more unsettling before the union is established. And in both situations, a poll serves the purpose of providing a neutral determination of the employees' support for the union, where such information is clearly relevant to employers in making legitimate decisions regarding their bargaining obligations under the Act. Moreover, to raise the bar to polling on the basis of the presumption of majority support would in effect make that presumption unassailable by denying employers the most effective, and least coercive, way to obtain information on the actual level of union support.

the same standard for polls and unilateral withdrawals is reasonable because the employer can still use polls to confirm a loss of majority support. As a practical matter, this leaves little room for polling, *supra*, at 381. But even conceding some remaining value to polling, the Board's rationale fails to address the basic inconsistency of imposing the same standard on two actions having dramatically different effects. Surely a unilateral withdrawal of recognition creates a greater disruption of the bargaining relationship and greater "doubts" in the minds of employees than does a poll. Consistent with the Board's reliance on such disruption to justify its polling standard, the standard for unilateral withdrawals should surely be higher.

The Board also asserts that having the same standard for RM elections and employer polls is justified by common practical and legal consequences, *i. e.*, the risk of the union's loss of its position as bargaining representative. But this argument fails as a factual matter. As the Board admits, an RM election is binding on a losing union for one year, 29 U. S. C. § 159(c)(3), while a union losing a poll may petition for a Board election at any time.[3] Brief for Respondent 40, n. 12. These differing consequences suggest the standard for polling should be lower. The Board's "avowed preference for RM elections," without some further legal or factual grounds for support, would not appear to justify a higher standard for polling. See *ante*, at 365. But in any event, that the Board *could* perhaps justify a higher standard for polling does not mean that it is rational to have the two standards equal, especially since doing so results in RM elections and

[3] On the other hand, if the union wins an employer poll, the employer apparently must recognize the union, *Nation-Wide Plastics, Inc.*, 197 N. L. R. B. 996 (1972), which is then entitled to a conclusive presumption of majority support for a reasonable time to permit bargaining. If an agreement is reached, a contract bar will apply. *Auciello Iron Works, Inc.* v. *NLRB*, 517 U. S. 781, 791 (1996). A losing employer thus would be barred for some time from conducting another poll.

unilateral withdrawals of recognition having the same standard as well. The Board thus irrationally equates the standard for polling with the standards for both unilateral withdrawals of recognition and RM elections.

The conclusion that the Board's standard is both irrational and without support in the Act is reinforced by longstanding decisions from this Court. In *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575, 616–617 (1969), an employer challenged the Board's determination that the employer's communications to its employees attempting to dissuade them from supporting the union violated § 8(a)(5). While upholding the finding of a violation on the facts presented, the Court noted that an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board. Thus, § 8(c), 29 U. S. C. § 158(c), merely implements the First Amendment by requiring that the expression of "any views, argument, or opinion" shall not be "evidence of an unfair labor practice," so long as such expression contains "no threat of reprisal or force or promise of benefit" in violation of § 8(a)(1). 395 U. S., at 617. See also *Thomas* v. *Collins*, 323 U. S. 516, 537 (1945) (union solicitation of employees is protected by First Amendment); *NLRB* v. *Virginia Elec. & Power Co.*, 314 U. S. 469, 477–478 (1941) (employer's attempts to persuade employees with respect to joining or not joining union are protected by First Amendment). The Court thus concluded that First Amendment rights, codified in § 8(c), limited the Board's regulatory authority to cases where the employer's speech contained a threat of reprisal or coercion.

Under *Gissel*'s reasoning, employer solicitation of employee views is protected speech, although such solicitation can constitutionally be prohibited where it amounts to coercion or threats of reprisal. There is no logical basis for a distinction between soliciting views, as in the instant case, and communicating views. Our decisions have concluded that First Amendment protection extends equally to the

right to receive information, *Kleindienst* v. *Mandel*, 408 U. S. 753, 762–763 (1972), and to the right to solicit information or responses, *Edenfield* v. *Fane*, 507 U. S. 761, 765–766 (1993); *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 761 (1976). More specifically, we concluded in *Thomas, supra,* at 534, that *union* solicitation of employee views and support is protected First Amendment activity. In finding union solicitation protected, *Thomas* relied on *Virginia Elec. & Power Co., supra,* as establishing that *employer's* attempts to persuade employees were protected First Amendment activity. 323 U. S., at 536–537.

It is not, however, necessary to resolve whether the Board's standard violates the First Amendment in this case. It is sufficient that the Board's interpretation of § 8(a)(1) to limit sharply employer polling raises difficult constitutional issues about employers' First Amendment rights. We have held that when an interpretation raises such constitutional concerns, the Board's interpretation of the Act is not entitled to deference. *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 574–577 (1988); *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 506–507 (1979); see also *Rust* v. *Sullivan*, 500 U. S. 173, 190–191 (1991).

In *DeBartolo*, we held that the Board's interpretation of the Act to proscribe peaceful handbilling by a union was not permissible. The Court acknowledged the Board's special authority to construe the Act and the normal deference it is therefore accorded. The Court nevertheless concluded that the Board's interpretation was not entitled to deference because, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." 485 U. S., at 575. See also *Bill Johnson's Restaurants, Inc.* v. *NLRB*, 461 U. S. 731, 742–743 (1983) (the Board's interpretation of the Act is untenable in light of First Amendment concerns

and state interests, even though its interpretation is a rational construction of the Act). As in *DeBartolo,* I conclude that § 8(a)(1) "is open to a construction that obviates deciding whether a congressional prohibition of [employer polling] on the facts of this case would violate the First Amendment." 485 U. S., at 578.

In my view, cases such as *Gissel, supra, Thomas, supra,* and *Virginia Elec. & Power Co., supra,* mean that the Board must allow polling where it does not tend to coerce or restrain employees. The Board must decide how and when in the first instance, but its decision must be rational, it must have a basis in the Act, and, of course, it may not violate the First Amendment.

The Court, however, concludes that the Board's standard is lawful. Accepting that conclusion, *arguendo,* I agree that the Board's findings are not supported by substantial evidence. I therefore join Parts I, III, and IV of the Court's opinion.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, concurring in part and dissenting in part.

I concur in Parts I and II and dissent from Parts III and IV of the Court's opinion. In Parts III and IV, the Court holds unlawful an agency conclusion on the ground that it is "not supported by substantial evidence." *Ante,* at 380; see 29 U. S. C. § 160(e); 5 U. S. C. § 706(2)(E). That question was not presented to us in the petition for certiorari. In deciding it, the Court has departed from the half-century old legal standard governing this type of review. See *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474, 490–491 (1951). It has rewritten a National Labor Relations Board (Board) rule without adequate justification. It has ignored certain evidentiary presumptions developed by the Board to provide guidance in the application of this rule. And it has failed to give the kind of leeway to the Board's factfinding authority

that the Court's precedents mandate. See, *e. g., Beth Israel Hospital* v. *NLRB,* 437 U. S. 483, 504 (1978).

To decide whether an agency's conclusion is supported by substantial evidence, a reviewing court must identify the conclusion and then examine and weigh the evidence. As this Court said in 1951, "[w]hether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals." *Universal Camera,* 340 U. S., at 491. The Court held that it would "intervene only in what ought to be the rare instance when the standard appears to have been *misapprehended or grossly misapplied.*" *Ibid.* (emphasis added); see *Beth Israel Hospital, supra,* at 507 (" 'misapprehended or grossly misapplied' "); *Golden State Bottling Co.* v. *NLRB,* 414 U. S. 168, 173 (1973) (" 'misapprehended or grossly misapplied' "). Consequently, if the majority is to overturn a court of appeals' "substantial evidence" decision, it must identify the agency's conclusion, examine the evidence, and then determine whether the evidence is so *obviously* inadequate to support the conclusion that the reviewing court must have seriously misunderstood the nature of its legal duty.

The majority opinion begins by properly stating the Board's conclusion, namely, that the employer, Allentown Mack Sales & Service, Inc., did not demonstrate that it

> "held a reasonable doubt, *based on objective considerations,* that the Union continued to enjoy the support of a majority of the bargaining unit employees." *Ante,* at 366 (emphasis added; internal quotation marks omitted).

The opinion, however, then omits the words I have italicized and transforms this conclusion, rephrasing it as:

> "Allentown lacked a genuine, reasonable uncertainty about whether Local 724 enjoyed the continuing support of a majority of unit employees." *Ante,* at 367.

Key words of a technical sort that the Board has used in hundreds of opinions written over several decades to express what the Administrative Law Judge (ALJ) here called "*objective* reasonable doubt" have suddenly disappeared, leaving in their place what looks like an ordinary jury standard that might reflect not an agency's specialized knowledge of the workplace, but a court's common understanding of human psychology. The only authority cited for the transformation, the dictionary, in fact offers no support, for the majority has looked up the wrong word, namely, "doubt," instead of the right word, "objective." In any event, the majority's interpretation departs from settled principles permitting agencies broad leeway to interpret their own rules, see, *e. g.*, *Thomas Jefferson Univ.* v. *Shalala,* 512 U. S. 504, 512 (1994) (courts "must give substantial deference to an agency's interpretation of its own regulations"); *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 413–414 (1945) (same), which may be established through rulemaking or adjudication, see *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 294 (1974); *SEC* v. *Chenery Corp.*, 332 U. S. 194, 202 (1947).

To illustrate the problem with the majority's analysis, I must describe the factual background, the evidence, and the ALJ's findings in some detail. In December 1990, three managers at Mack Trucks (and several other investors) bought Mack. All of the 45 employees in the union's bargaining unit were dismissed. The new owners changed the company's name to Allentown and then interviewed and rehired 32 of the 45 recently dismissed workers, putting them back to work at jobs similar to those they previously held. The union, which had represented those employees for 17 years, sought continued recognition; Allentown refused it; the Board's general counsel brought unfair labor practice charges; and the ALJ found that Allentown was a "successor" corporation to Mack, 316 N. L. R. B. 1199, 1204 (1995), a finding that was affirmed by the Board, *id.*, at 1199, and was not challenged in the Court of Appeals. Because Allen-

town was found to be a "successor" employer, the union was entitled to a rebuttable presumption of majority status. See *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S. 27, 41 (1987). Absent some extraordinary circumstance, when a union enjoys a rebuttable presumption of majority status, the employer is obligated to recognize the union unless 30% of the union's employees petition the Board for a decertification election (and the union loses), *Texas Petrochemicals Corp.*, 296 N. L. R. B. 1057, 1062 (1989), enf'd as modified, 923 F. 2d 398 (CA5 1991); see 29 U. S. C. § 159(c)(1)(A)(ii); 29 CFR § 101.18(a) (1997), or the employer shows that "either (1) the union did not *in fact* enjoy majority support, or (2) the employer had a good-faith doubt, founded on a sufficient objective basis, of the union's majority support," see *NLRB* v. *Curtin Matheson Scientific, Inc.*, 494 U. S. 775, 778 (1990) (emphasis deleted; internal quotation marks and citations omitted).

Allentown took the last mentioned of these options. According to the ALJ, it sought to show that it had an "objective" good-faith doubt primarily by presenting the testimony of Allentown managers, who, in turn, reported statements made to them by 14 employees. The ALJ set aside the statements of 5 of those employees as insignificant for various reasons—for example because the employees were not among the rehired 32, because their statements were equivocal, or because they made the statements at a time too long before the transition. 316 N. L. R. B., at 1206–1207. The majority does not take issue with the ALJ's reasoning with respect to these employees. The ALJ then found that statements made by six, and possibly seven, employees (22% of the 32) helped Allentown show an "objective" reasonable doubt. *Id.*, at 1207. The majority does not quarrel with this conclusion. The majority does, however, take issue with the ALJ's decision not to count in Allentown's favor three further statements, made by employees Marsh, Bloch, and Mohr. *Id.*, at 1206–1207. The majority says that these

statements *required* the ALJ and the Board to find for Allentown. I cannot agree.

Consider Marsh's statement. Marsh said, as the majority opinion notes, that "'he was not being represented for the $35 he was paying.'" *Ante,* at 369; 316 N. L. R. B., at 1207. The majority says that the ALJ was wrong not to count this statement in the employer's favor. *Ante,* at 369. But the majority fails to mention that Marsh made this statement to an Allentown manager while the manager was interviewing Marsh to determine whether he would, or would not, be one of the 32 employees whom Allentown would reemploy. The ALJ, when evaluating all the employee statements, wrote that statements made to the Allentown managers during the job interviews were "somewhat tainted as it is likely that a job applicant will say whatever he believes the prospective employer wants to hear." 316 N. L. R. B., at 1206. In so stating, the ALJ was reiterating the Board's own normative general finding that employers should not "rely in asserting a good-faith doubt" upon "[s]tatements made by employees during the course of an interview with a prospective employer." *Middleboro Fire Apparatus, Inc.,* 234 N. L. R. B. 888, 894, enf 'd, 590 F. 2d 4 (CA5 1978). The Board also has found that "'[e]mployee statements of dissatisfaction with a union are not deemed the equivalent of withdrawal of support for the union.'" *Torch Operating Co.,* 322 N. L. R. B. 939, 943 (1997) (quoting *Briggs Plumbingware, Inc.* v. *NLRB,* 877 F. 2d 1282, 1288 (CA6 1989)); see also *Destileria Serralles, Inc.,* 289 N. L. R. B. 51 (1988), 882 F. 2d 19 (CA1 1989). Either of these general Board findings (presumably known to employers advised by the labor bar), applied by the ALJ in this particular case, provides more than adequate support for the ALJ's conclusion that the employer could not properly rely upon Marsh's statement as help in creating an "objective" employer doubt.

I do not see how, on the record before us, one could plausibly argue that these relevant general findings of the Board

fall outside the Board's lawfully delegated authority. The Board in effect has said that an employee statement *made during a job interview with an employer who has expressed an interest in a nonunionized work force* will often tell us precisely *nothing* about that employee's true feelings. That Board conclusion represents an exercise of the kind of discretionary authority that Congress placed squarely within the Board's administrative and factfinding powers and responsibilities. See *Radio Officers* v. *NLRB*, 347 U. S. 17, 49–50 (1954). Nor is it procedurally improper for an agency, rather like a common-law court, (and drawing upon its accumulated expertise and exercising its administrative responsibilities) to use adjudicatory proceedings to develop rules of thumb about the likely weight assigned to different kinds of evidence. Cf. *Bell Aerospace*, 416 U. S., at 294; *Chenery*, 332 U. S., at 202.

Consider next Bloch's statement, made during his job interview with Worth, that those on the night shift (five or six employees) "did not want the Union." 316 N. L. R. B., at 1207. The ALJ thought this statement failed to provide support, both for reasons that the majority mentions ("'Bloch did not testify and thus could not explain how he formed his opinion about the views of his fellow employees'"), *ante*, at 369; 316 N. L. R. B., at 1207, and for reasons that the majority does not mention ("no showing that [the other employees] made independent representations about their union sympathies to [Allentown] and they did not testify in this proceeding"), *ibid.*

The majority says that "reason demands" that Bloch's statement "be given considerable weight." *Ante*, at 370. But why? The Board, drawing upon both reason and experience, has said it will "view with suspicion and caution" one employee's statements "purporting to represent the views of other employees." *Wallkill Valley General Hospital*, 288 N. L. R. B. 103, 109 (1988), enf'd as modified, 866 F. 2d 632 (CA3 1989); see also *Louisiana-Pacific Corp.*, 283 N. L. R. B.

1079, 1080, n. 6 (1987); *Bryan Memorial Hospital,* 279
N. L. R. B. 222, 225 (1986), enf'd 814 F. 2d 1259 (CA8 1987).
Indeed, the Board specifically has stated that this type of
evidence does not qualify as "objective" within the meaning
of the "objective reasonable doubt" standard. *Wallkill Val-
ley General Hospital, supra,* at 109–110 (finding that state-
ment by one employee that other employees opposed the
union "cannot be found to provide *objective* considerations"
because statement was a "bare assertion," was "subjective,"
and "lacking in demonstrable foundation"; statement by an-
other employee about the views of others was similarly "in-
sufficiently reliable and definite to contribute to a finding of
*objective* considerations" (emphases added)).

How is it unreasonable for the Board to provide this kind
of guidance, about what kinds of evidence are more likely,
and what kinds are less likely, to support an "objective rea-
sonable doubt" (thereby helping an employer understand just
when he may refuse to bargain with an established employee
representative, in the absence of an employee-generated
union decertification petition)? Why is it unreasonable for
an ALJ to disregard a highly general conclusory statement
such as Bloch's, a statement that names no names, is unsup-
ported by any other concrete testimony, and was made dur-
ing a job interview by an interviewer who foresees a non-
unionized workforce? To put the matter more directly, how
can the majority substitute its own judgment for that of the
Board and the ALJ in respect to such detailed workplace-
related matters, particularly on the basis of this record,
where the question whether we should set aside this kind of
Board rule has not even been argued?

Finally, consider the Allentown manager's statement that
Mohr told him that "if a vote was taken, the Union would
lose." 316 N. L. R. B., at 1207. Since, at least from the
perspective of the ALJ and the Board, the treatment of this
statement presented a closer question, I shall set forth the
ALJ's discussion of the matter in full.

The ALJ wrote:

> "Should Respondent be allowed to rely on Mohr's opinion? As opposed to Bloch who offered the opinion that the night shift employees did not support the Union, Mohr, as union steward, was arguably in a position to know the sentiments of the service employees in the bargaining unit in this regard. However, there is no evidence with respect to how he gained this knowledge, or whether he was speaking about a large majority of the service employees being dissatisfied with the Union or a small majority. Moreover, he was referring to the existing service employee members of the Mack bargaining unit composed of 32 employees, whereas the Respondent hired only 23 of these men. Certainly the composition of the complement of employees hired would bear on whether this group did or did not support the Union. He also was not in a position to speak for the 11 parts employees of Mack or the 7 parts employees hired by Respondent. Mohr himself did not indicate personal dissatisfaction with the Union." *Id.*, at 1208.

The ALJ concluded:

> "Given the almost off-the-cuff nature of [Mohr's] statement and the Board's historical treatment of unverified assertions by an employee about other employees' sentiments, I do not find that Mohr's statements provides *[sic]* sufficient basis, even when considered with the other employee statements relied upon, to meet the Board's objective reasonable doubt standard for withdrawal of recognition or for polling employees." *Ibid.*

One can find reflected in the majority opinion some of the reasons the ALJ gave for discounting the significance of Mohr's statement. The majority says of the ALJ's first reason (namely, that "'there is no evidence with respect to how'" Mohr "'gained this knowledge'") that this reason is "irrelevan[t]." *Ante*, at 370. But why so? The lack of any

specifics provides some support for the possibility that Mohr was overstating a conclusion, say, in a job-preserving effort to curry favor with Mack's new managers. More importantly, since the absence of detail or support brings Mohr's statement well within the Board's pre-existing cautionary evidentiary principle (about employee statements regarding the views of other employees), it diminishes the reasonableness of any employer reliance.

The majority discusses a further reason, namely, that Mohr was referring to a group of 32 employees of whom Allentown hired only 23, and "the composition of the complement of employees hired would bear on whether this group did or did not support the Union." 316 N. L. R. B., at 1208. The majority considers this reason "wholly irrational," because, in its view, the Board cannot "rationally" assume that

> "the work force of a successor company has the same disposition regarding the union as did the work force of the predecessor company, if the majority of the new work force came from the old one," *ante*, at 370,

while adopting an opposite assumption

> "for purposes of determining what evidence tends to establish a reasonable doubt regarding union support," *ibid.*

The irrationality of these assumptions, however, is not obvious. The primary objective of the National Labor Relations Act is to secure labor peace. *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S., at 38. To preserve the status quo ante may help to preserve labor peace; the first presumption may help to do so by assuming (in the absence of contrary evidence) that workers wish to preserve that status quo, see *id.*, at 38–40; the second, by requiring detailed evidence before dislodging the status quo, may help to do the same. Regardless, no one has argued that these presumptions are contradictory or illogical.

The majority fails to mention the ALJ's third reason for discounting Mohr's statement, namely, that Mohr did not indicate "whether he was speaking about a large majority of the service employees being dissatisfied with the Union or a small majority." 316 N. L. R. B., at 1208. It fails to mention the ALJ's belief that the statement was "almost off-the-cuff." *Ibid.* It fails to mention the ALJ's reference to the "Board's historical treatment of unverified assertions by an employee about other employees' sentiments" (which, by itself, would justify a considerable discount). *Ibid.* And, most importantly, it leaves out the ALJ's conclusion. The ALJ did not conclude that Mohr's statement lacked evidentiary significance. Rather, the ALJ concluded that the statement did not provide *"sufficient* basis, even when considered with other employee statements relied upon, to meet the Board's objective reasonable doubt standard." *Ibid.* (emphasis added).

Given this evidence, and the ALJ's reasoning, the Court of Appeals found the Board's conclusion adequately supported. That conclusion is well within the Board's authority to make findings and to reach conclusions on the basis of record evidence, which authority Congress has granted, and this Court's many precedents have confirmed. See, *e. g., Beth Israel Hospital* v. *NLRB,* 437 U. S., at 504.

In sum, the majority has failed to focus upon the ALJ's actual conclusions, it has failed to consider all the evidence before the ALJ, it has transformed the actual legal standard that the Board has long administered without regard to the Board's own interpretive precedents, and it has ignored the guidance that the Board's own administrative interpretations have sought to provide to the bar, to employers, to unions, and to its own administrative staff. The majority's opinion will, I fear, weaken the system for judicial review of administrative action that this Court's precedents have carefully constructed over several decades.

For these reasons, I dissent.