*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0137P (6th Cir.)
File Name: 01a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATIONAL LABOR RELATIONS
BOARD,

*Petitioner,*

TEAMSTERS LOCAL UNION
NO. 20,

*Intervenor,*

*v.*

SEAWIN, INC.,

*Respondent.*

No. 99-6624

On Application for Enforcement of an Order of
the National Labor Relations Board.
No. 8-CA-30514.

Argued: January 30, 2001

Decided and Filed: April 26, 2001

Before: JONES and COLE, Circuit Judges; NUGENT,
District Judge.[*]

_____

[*] The Honorable Donald C. Nugent, United States District Judge for the Northern District of Ohio, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Timothy C. McCarthy, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Respondent. Frederick C. Havard, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner. John M. Roca, GALLON & TAKACS, Toledo, Ohio, for Intervenor. **ON BRIEF:** Timothy C. McCarthy, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Respondent. Aileen A. Armstrong, Joan Hoyte-Hayes, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. John M. Roca, GALLON & TAKACS, Toledo, Ohio, for Intervenor.

JONES, J., delivered the opinion of the court, in which NUGENT, D. J., joined. COLE, J. (pp. 15-22), delivered a separate dissenting opinion.

---

**OPINION**

---

NATHANIEL R. JONES, Circuit Judge. Petitioner, the National Labor Relations Board ("NLRB" or "the Board") seeks enforcement of its decision and order finding that Respondent, Seawin, Inc. ("Seawin") violated 29 U.S.C. § 158(a)(1) and (a)(5) by refusing to bargain with a certified union. Seawin challenges the certification of the union on the ground that votes were improperly cast by eleven laid-off workers who had no reasonable expectancy of recall at the time of the representation election. For the reasons provided below, we find that the NLRB's decision was not supported by substantial evidence; accordingly, enforcement of the order is **DENIED**.

*Fabrications Corp.*, 222 F.3d at 225 ("It is the NLRB's function to resolve questions of fact and credibility. The court, therefore, will not ordinarily disturb credibility evaluations by an Administrative Law Judge who observed the witnesses' demeanor."). While I recognize that we are not a "mere rubber stamp" for the Board's factual and credibility determinations, *NLRB v. Cook Family Foods, Ltd.*, 47 F.3d 809, 816 (6th Cir. 1995), I nevertheless conclude that the inferences drawn by the Board from the evidence presented were reasonable, and the Board's conclusions are supported by substantial evidence. I would enforce the Board's bargaining order.

## I. BACKGROUND

Seawin is the Ohio subsidiary of Alkon Corporation. Alkon is a New Jersey corporation that manufactures and sells flow controls, directional valves and fittings for the pneumatic industry. Seawin, since its incorporation in 1991, has manufactured the valves sold by Alkon. In early 1997, Seawin also began manufacturing fittings, which Alkon had previously imported from Brazil.

Seawin's production of fittings, which comprises 80% of Alkon's business, played a key role in the layoff of seventeen production employees in mid-January of 1998. Several factors led to the layoffs: First, Seawin was inefficient in evaluating its inventory needs, producing fittings in excess of demand. As a result, Seawin's total inventory increased by 52% between 1996 and 1997.[1] Second, Alkon lost several key customers. In 1997, Alkon lost two customers to whom it sold fittings, representing 12-13% of its sales. In January of 1998, Alkon's largest customer, which comprised 8-9% of its sales, elected to purchase fittings from another company. The type of fitting that was sold to this customer was particularly labor intensive. The loss of these key customers had a dramatic effect on Alkon's net income. Alkon's net income for the fiscal year of April 1, 1997-March 31, 1998 was $86,966 compared to $718,453 the prior year, representing a decrease of 88%. Third, Alkon lost money in December of 1997. Mark Winter, the president of Alkon, testified that this profit loss indicated that it was not possible for Alkon to make a profit with its then-existing complement of employees. Consequently, Winter and his management team at Alkon decided to make a staff reduction in January of 1998, laying off seventeen of Seawin's production employees.

Seawin made several changes shortly after the layoffs in order to make its production process more efficient. In February 1998, Seawin installed a new computer system to

---

[1]In 1996, Seawin had $1,900,000 in inventory compared to $2,900,000 by the end of 1997. Tr. at 170.

help better identify its inventory needs. Seawin also significantly increased automation and subcontracted to have automated equipment built. Winter testified that "it was an entirely different" plant than it was prior to the layoffs due in large measure to the increased focus on improving efficiency. Tr. at 178. Winter further testified that the layoffs were intended to be permanent--the idea was to increase efficiency by operating with a smaller workforce. While none of the laid-off employees worked exclusively in the fittings department, the vast majority of their time (at least 90%) was spent in that department. Several of the laid-off employees were subsequently recalled to fill positions made available by attrition; i.e., to replace people who either quit or were terminated for cause. The total number of employees at Seawin remained constant in the months following the layoffs.

At the time of the layoffs, Charles Gaitros, the vice-president of Seawin, met collectively with the employees working in the fittings area. Gaitros told them that, because of excess inventories, he had to layoff workers from the fittings department. He also told them that he "hoped that business . . . would turn around soon." Tr. at 53. Gail Winter, a Union witness, asked Gaitros when they would be called back. Winter testified that Gaitros said "hopefully by the end of February." Tr. at 147. On cross-examination, Winter testified that she specifically recalled Gaitros using the word "hopefully." Diane Jackson, a Union witness, testified that when Gail Winter asked when they would be called back, Gaitros said "probably" around two weeks to a month. Tr. at 103. Tammy Ruffing, a Union witness, testified that Gaitros said it "could" be a week, two weeks, or a month. Tr. at 135. Rose Priddy, a Union witness, testified that she asked Gaitros over the phone if she would be recalled. Priddy stated that "from what I can remember" he said yes. Tr. at 116. Gaitros told the laid-off employees that they should contact the office and keep their applications updated. None of the laid-off employees tried to contact the employer in the two months between the layoffs and the representation election.

The Hearing Officer specifically found that Seawin had commenced construction of a warehouse in December 1997, which was completed shortly before the August 1998 hearing in this matter. The president of Seawin's parent company, Mark Winter, testified regarding the new computer system installed in February 1998 to better monitor inventories, and also boasted about the ongoing automation of Seawin's production processes.

Seawin argues that its declining business, together with its investments in modernizing its manufacturing operations, is evidence of fundamental change in the nature and scope of its business, thus precluding the laid-off employees from having any reasonable expectation of recall. It seems to me, however, that an equally reasonable inference to draw from this evidence is that the company was experiencing temporary setbacks that would be resolved quickly by enhancements to, and expansion of, the company's existing operations. This inference is particularly plausible in light of Gaitros's statements to employees that they could expect to be recalled within two weeks to a month, Gaitros's statement to the newspaper that he anticipated an increase in the employee complement once the warehouse was completed, and Gaitros's testimony before the Hearing Officer that Seawin did not intend to cease the manufacture of fittings. *See Nordam, Inc.*, 173 N.L.R.B. 1153, 1154 (1968) (employer's claim that he intended layoff to be permanent undermined by fact that he did not disclose that intent to employees or to company official responsible for implementing layoffs).

### III. CONCLUSION

In sum, while I agree with the majority that there is evidence supporting Seawin's argument that the layoffs were the result of a fundamental change in the company's business operations, this evidence is not sufficient to justify overturning the Board's decision in this case. This is particularly true when the Board's decision to certify the election results rested in large part on the credibility of the witnesses testifying before the Hearing Officer. *See Gen.*

1998 layoff. The article discussed a tax abatement agreement reached between Seawin and the City of Fremont, and quoted Gaitros as saying that the layoff was partly a result of construction delays in Seawin's equipment expansion project. The article further quoted Gaitros as saying, "When the project is done, we will have the number of employees (54) stated in the agreement." Gaitros denied making the statement, and further denied ever having been interviewed by the paper. Nevertheless, Gaitros admitted reading the article and also conceded that he did not attempt to contact the newspaper to have the article corrected.

The record also indicates that on September 4, 1997, Seawin and the City of Fremont entered into a tax abatement agreement in which Fremont promised to grant a tax exemption to Seawin in return for Seawin's promise to retain fifty-four full-time jobs at its Fremont facility. The exemption was intended to facilitate Seawin's new expansion. The Hearing Officer noted that at the time of the August 11, 1998, hearing, Seawin employed only fifty full-time employees and thus would need to add at least four employees to be in compliance with the tax abatement agreement. The Hearing Officer accordingly found that Gaitros's statements in the newspaper article, coupled with Seawin's noncompliance with the tax abatement agreement, supported the employees' argument that they had a reasonable expectation of being recalled by Seawin.

Finally, there is ample evidence in the record to support the Board's conclusion that the layoffs were not occasioned by a change in the nature or scope of Seawin's business. It is true that Seawin submitted evidence showing that the company's inventory had increased and its sales had declined, primarily as a result of the company losing two of its key customers. However, the Hearing Officer accorded little weight to this evidence, and pointed out that there were "no compelling factors that would indicate that new sales would not be obtained or that business would not increase . . . ." To the contrary, the evidence indicated that Seawin was actively committed to enhancing its productivity and performance.

On February 9, 1998, Teamsters Local Union No. 20 ("Union") filed a petition with the NLRB seeking to represent Seawin's production and maintenance employees. On February 19, 1998, the Board's Regional Director approved a stipulated election agreement between Seawin and the Union which provided that "[t]he eligible voters shall be unit employees employed during the payroll period for eligibility, including employees who did not work during that period because they were . . . temporarily laid off . . . ." J.A. at 68. On March 25, 1998, the Board conducted a representation election. The vote was twenty for union representation and nineteen against union representation with thirteen challenged ballots. The Board agent challenged the ballots of eleven laid-off employees because their names were not on the eligibility list.[2] On July 29, 1998, after investigation of the challenges, the Regional Director ordered a hearing to resolve the issue of the employees' voting eligibility. On October 21, 1998, the Hearing Officer issued a report concluding that the eleven laid-off employees had a reasonable expectation of recall and were, thus, eligible to vote in the election. The Hearing Officer recommended that the challenges be overruled and the eleven ballots be counted. Seawin excepted to the Hearing Officer's report and recommendations.

On November 30, 1998, the NLRB issued its decision adopting the Hearing Officer's findings and recommendations and directing the Regional Director to count the eleven challenged ballots. The revised tally showed that thirty-one ballots were cast for union representation and twenty-one were cast against union representation. The NLRB certified the Union as the employees' collective bargaining unit. Following certification, the Union requested that Seawin bargain; however, Seawin refused the Union's bargaining demand. The Union filed an unfair labor practice charge alleging that Seawin's refusal to bargain violated 29 U.S.C.

---

[2]The Union challenged two ballots because the individuals who cast those ballots were supervisors. The Board overruled those challenges and directed the two challenged ballots to be counted. J.A. at 17.

§ 158(a)(1) and (a)(5).[3]  On May 11, 1999, the Board concluded that Seawin's refusal to bargain violated 29 U.S.C. § 158(a)(1) and (a)(5) and ordered Seawin to cease and desist from the unfair labor practices and bargain with the Union upon request.

## II. LEGAL ANALYSIS

### A.  Standard of Review

The findings of the Board will not be disturbed by this court if they are supported by substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491 (1951). In determining whether the Board's findings are supported by substantial evidence, we must ask whether the Board considered "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." *R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 818 (6th Cir. 1999). We must uphold the Board's findings if supported by substantial evidence even if "the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488.  However, this court must review evidence in the record that runs contrary to the Board's findings and conclusions. *See DTR Indus., Inc. v. NLRB*, 39 F.3d 106, 110 (6th Cir.1994);  *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993).

---

[3]29 U.S.C. § 158(a)(1) provides that: "It shall be an unfair labor practice for an employer  to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(5) provides that: "It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees . . . ."

"vague statements by the employer about the chance or possibility of the employee being hired will not overcome the totality of the evidence to the contrary." *Ideal Macaroni*, 989 F.2d at 882 (quoting *Sol-Jack*, 286 N.L.R.B. at 1174).  The majority consequently dismisses Gaitros's statements to the laid-off employees as "equivocal." The majority's reliance on *Ideal Macaroni* and *Sol-Jack* is misplaced, however.  Where, as here, an employer's expressed anticipation of recall tends to be *supported* by extant objective circumstances, the Board is certainly warranted in assigning more than minimal weight to the employer's expressions.  Neither *Ideal Macaroni* nor *Sol-Jack* is to the contrary.[1]  Moreover, this Court is in a poor position to second-guess the Hearing Officer's credibility determinations with respect to witness testimony regarding Gaitros's pre-election statements to the laid-off employees. *See Roadway Express, Inc. v. NLRB*, 831 F.2d 1285, 1289 (6th Cir. 1987) (noting that reviewing courts rarely disturb determinations of credibility made by the Board).  While Gaitros and the employee-witnesses may have agreed that Gaitros's statements were unclear as to *when* the employees would be recalled, Gaitros and the employees disagreed as to *whether* the employees were to be recalled.  Given the conflicting testimony on this issue, the Board was entitled to conclude that Gaitros's statements to the laid-off employees supported a finding that the employees had a reasonable expectation of recall at the time of election.

The Hearing Officer also considered an article published in the Fremont *Daily News Messenger* shortly after the January

---

[1]The Court in *Ideal Macaroni* discounted the significance of the employer's expressed anticipation of recall because "'surrounding objective facts'" did not support a reasonable anticipation of recall.  989 F.2d at 882 (quoting *Ideal Macaroni*, 301 N.L.R.B. 507, 510 n.13 (1991) (Member Cracraft, dissenting)).  Similarly, in *Sol-Jack*, the Board discounted the employer's expressions anticipating recall, observing that such statements do not "overcome the totality of the evidence."  286 N.L.R.B. at 1174.  Significantly, the employer in *Sol-Jack* disavowed -- prior to the election -- his previous statements regarding the possibility that the company would recall the laid-off employees.  There is no indication in this case that the company disavowed Gaitros's statements.

I agree with the majority that Seawin presented some evidence that the scope and nature of its business had changed, which change arguably necessitated a permanent layoff of the eleven Seawin employees. Indeed, the majority may even be correct to conclude that Seawin's evidence in support of this argument was "substantial." The majority commits a subtle but critical error, however, in reversing the Board for failing to adopt Seawin's version of the facts, even if Seawin's version may have been supported by substantial evidence. The question before this Court is whether the factual conclusion reached by the Board is supported by substantial evidence, not whether an opposite conclusion is also supported by substantial evidence. *See Cutlip*, 25 F.3d at 286 ("If the Secretary's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion."). As discussed below, the Board's factual findings are more than adequately supported by substantial record evidence.

The Board's Hearing Officer heard testimony from several of the laid-off employees as well as from Charles Gaitros, Seawin's vice-president responsible for implementing the layoffs, and expressly credited the employees' version of the facts over the version presented by Gaitros. Specifically, the Hearing Officer gave great weight to the testimony of employees Diane Jackson, Rose Priddy, Tammy Ruffing, and Gail Winter. Jackson testified that Gaitros told the employees they would be recalled within two weeks to a month. Priddy testified that Gaitros told her that she would be recalled in a "couple of weeks to a month." She also testified that when she asked Gaitros if she would be recalled, he said "to my knowledge, yes." Ruffing testified that Gaitros said that the employees would be recalled in "a week, two weeks or a month." Winter testified that she asked Gaitros when the employees would be recalled, to which he responded, "hopefully by the end of February."

The majority points to our decision in *Ideal Macaroni* and the Board's decision in *Sol-Jack* for the proposition that

## B.  Reasonable Expectancy of Recall

A reasonable expectancy of recall in the near future entitles a laid-off employee to vote in a representation election. *See NLRB v. Apex Paper Box Co.*, No. 91-6189, 1992 WL 229294, at *2 (6th Cir. Sept. 17, 1992)(unpublished). The test is whether the laid-off employee has a reasonable expectancy of recall at the time of the election. *See Hughes Christenson Co. v. NLRB*, 101 F.3d 28, 30-31 (5th Cir. 1996); *Madison Indus., Inc.*, 311 N.L.R.B. 865, 866 (1993); *Schwartz Mfg. Co.,* 289 N.L.R.B. 874, 899 (1988). The objective factors that support a reasonable expectancy of recall are the employer's past experience of recalls, the circumstances surrounding the layoffs, what the employees were told about the likelihood of recall, and the future plans of the employer. *See Osram Sylvania, Inc.*, 325 N.L.R.B. 758, 760 (1998); *UXB International, Inc.*, 321 N.L.R.B. 446, 453 (1996).

In the case at bar, Seawin has no prior history of seasonal or cyclical layoffs nor any policy or practice of recalling laid-off employees. Thus, the prior experience of Seawin clearly provides no basis for the conclusion that the laid-off employees had a reasonable expectancy of recall. *See Sol-Jack Co.,* 286 N.L.R.B. 1173, 1174 (1987) (finding that a history of seasonal or cyclical layoffs supports the conclusion that laid-off employees had a reasonable expectancy of recall). Of course, the absence of a prior policy of recalling laid-off employees does not prove that they did not have a reasonable expectancy of recall. Thus, we must focus our attention on the other factors.

## 1.   Circumstances Surrounding the Layoff

The circumstances surrounding the layoff indicate that the laid-off employees had no reasonable expectancy of recall. The Hearing Officer acknowledged that

the Employer introduced evidence which would indicate that (a) their inventory has increased in 1997 and (b) the sales also declined. The record reflects that it had lost a

couple of customers, one of which was approximately
10% of its fitting line business.

J.A. at 93.

The NLRB has repeatedly found that a layoff under these
circumstances does not give rise to a reasonable expectancy
of recall by laid-off employees. *See Osram Sylvania, Inc.*,
325 N.L.R.B. at 760 (loss of sales is objective factor
indicating that laid-off employees had no reasonable
expectation of recall); *Sol-Jack*, 286 N.L.R.B. 1173 (decline
in sales due to loss of major customer is an objective factor
weighing against reasonable expectancy of recall); *Heatcraft*,
250 N.L.R.B. 58 (1980) (reduction in sales and buildup of
unusually high inventory is basis for concluding that laid-off
employees did not have reasonable expectation of recall in the
near future). Accordingly, the undisputed evidence of a
diminished customer base, decline in sales, and high
inventory compellingly indicate that the laid-off employees
had no reasonable expectancy of recall.

Rather than reaching this conclusion, the Hearing Officer
found that "there is no evidence on the record that the
Employer had changed the nature or scope of its business that
would suggest the employees had no reasonable expectancy
of recall." J.A. at 93. Although we must give some
deference to the Board's findings, that deference does not
obligate this court to ignore evidence that contradicts the
Board's conclusions. *See DTR Indus.*, 39 F.3d at 110 (court
must review evidence in the record that runs contrary to the
Board's decision); *Pentre Elec., Inc.*, 998 F.2d at 368; *cf.
Uforma/Shelby Business Forms, Inc. v. NLRB*, 111 F.3d
1284, 1292 (6th Cir. 1997) (court is not a mere "rubber
stamp" for the Board's decisions).

The Board's conclusion that there is no evidence that
Seawin changed the nature or scope of its business is flatly
refuted by the record. The record clearly indicates that, shortly
after the layoffs, Seawin significantly increased its automation
and subcontracted to have automated equipment built. In
addition, Seawin installed a new computer system in order to

## II. DISCUSSION

I do not disagree with the majority regarding the substantive
legal standard applicable in this case. I believe, however, that
the majority misapplied this standard in setting aside the
Board's factual determinations. As the Court notes, it has
long been the rule that laid-off employees may vote in a
representation election if, as of the payroll-eligibility date and
the date of the election, they have a reasonable expectation of
being recalled in the near future. *See NLRB v. Ideal
Macaroni Co.*, 989 F.2d 880, 881 (6th Cir. 1993); *NLRB v.
Apex Paper Box Co.*, 302 N.L.R.B. 67, 68 (1991),
*enforcement denied*, 976 F.2d 733 (6th Cir. 1992) (table);
*NLRB v. Franklin Art Glass Studios, Inc.*, 675 F.2d 106, 106
(6th Cir. 1982). In determining whether an expectation of
recall was reasonable, the Board considers objective factors,
including the company's future plans, past experiences, and
the circumstances of the layoff. *See Sol-Jack Co.*, 286
N.L.R.B. 1173, 1173 (1987). The Board may also consider
what was said by the employer to the employees regarding the
likelihood of recall; however, "vague statements by the
employer about the chance or possibility of the employee
being hired will not overcome the totality of the evidence to
the contrary." *Id.* at 1174.

The majority makes much of the evidence presented by
Seawin regarding its diminished customer base, its declining
sales, and its high inventory at the time the company decided
to lay off the eleven employees. The majority points to
evidence presented by Seawin that, after the layoffs, the
company purchased automated production equipment and
installed new computer systems for more efficient inventory
management. The majority relies on this evidence to refute
the Hearing Officer's conclusion that "there is no evidence on
the record that the Employer had changed the nature or scope
of its business." The majority also cites cases in which the
Board and the courts of appeals have found that similar
evidence supports a conclusion that laid-off employees had no
reasonable expectation of recall.

substantial evidence," *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 523 (1981) (internal quotation marks omitted).

The Supreme Court has recently noted that the substantial evidence standard requires a reviewing court to ask "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366-67 (1998). The substantial evidence standard "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy a reasonable factfinder." *Id.* at 377 (emphasis in original). We may set aside the Board's findings, therefore, only "when the record before [us] clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Universal Camera*, 340 U.S. at 490.

We have described the substantial evidence standard of review in a different context as follows:

> Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. This court does not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility. . . . If the Secretary's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and *even if substantial evidence also supports the opposite conclusion.*

*Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1984) (citations omitted) (emphasis added). With these principles in mind, it is clear to me that the majority errs in refusing to enforce the Board's order in this case.

more accurately determine its inventory needs. The Sixth Circuit has found that similar changes in a company's production process support a finding that laid-off employees had no reasonable expectancy of recall. In *NLRB v. Ideal Macaroni Co.*, 989 F.2d 880 (6th Cir. 1993), the Court noted that the company's modernization of its past manufacturing operation through the installation of new machinery was not the type of change "reflective of fluctuations in the workload" that would support a finding that employees could reasonably expect to be recalled. *Id.* at 882. The Fifth Circuit in *Hughes Christensen Co. v. NLRB*, in finding that the laid-off employees had no reasonable expectancy of recall, observed that automated equipment at the plant reduced the need for many of the workers. *See* 101 F.3d at 31. Finally, in *Zatko Metal Products Co.*, 173 N.L.R.B. 27 (1968), the NLRB found that "there was considerable change in [the Company's] methods of production in the form of replacement of old machines with new, more efficient apparatus, and improvement of existing machinery by adoption of automated processes." *Id.* at 32. The NLRB concluded that the laid-off employees did not have a reasonable expectation of recall. Similarly, in the case at bar, the modernization of Seawin's production processes indicates a decreased need for the labor intensive services of the laid-off production workers. This change in the nature of Seawin's business deprives the laid-off employees of a reasonable expectancy of recall.

In sum, the financial condition of the company before the layoffs and the changes in the production process after the layoffs squarely indicate that the laid-off employees had no reasonable expectation of recall in the near future. The Hearing Officer's conclusion to the contrary ignores "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." *R.P. Carbone Constr. Co.*, 166 F.3d at 818. Thus, we are not bound by the Board's finding.[4]

---

[4] The Hearing Officer also found that it was not Seawin's intention to get out of the fitting line of business and concluded from this fact that the laid-off employees had a reasonable expectancy of recall. J.A. at 94.

### 2.    What the Employees Were Told About the Likelihood of Recall

It is well settled that "[w]hen objective factors indicate a laid-off employee had no reasonable expectation of recall, vague statements by the employer about the chance or possibility of the employee being hired will not overcome the totality of the evidence to the contrary." *Ideal Macaroni*, 989 F.2d at 882 (quoting *Sol-Jack*, 286 N.L.R.B. 1173 (1987)). In *Ideal Macaroni*, the Court, in concluding that the workers had no reasonable expectancy of recall, found that "the statements made to each of the employees on the occasion of their layoffs were vague as to when and if the employees were to be recalled." *Id.* at 881. In *Sol-Jack*, the NLRB found that there was no reasonable expectancy of recall despite testimony that an employee was told by the part-owner of the company that he might be back to work in one or two weeks. *See* 286 N.L.R.B. at 1173. In the case at bar, Gail Winter testified that Gaitros told her "hopefully" she would be recalled by the end of February. Tammy Ruffing testified that Gaitros said it "could" be a week, two weeks, or a month. While Diane Jackson testified that Gaitros said it would "probably" be around two weeks.[5] Such equivocal statements

---

However, in light of the uncontested evidence of declining sales, building inventory, eroding customer base, and increasing automation, the fact that Seawin is not getting out of the fitting line of business simply is not dispositive, nor has any court or the NLRB ever held that to be a necessary element for finding no reasonable expectancy of recall.

[5] The Hearing Officer stated that he "credit[s] the employees' version of the facts over that of Employer Vice President Charles Gaitros . . . ." J.A. at 93. However, the record is quite clear that Gail Winter's testimony corroborates that of Gaitros. Gaitros testified that he told the employees that he "hoped" business would turn around. Tr. at 53. Gail Winter testified that she specifically remembered Gaitros using the word "hopefully" in discussing the likelihood of recall. Tr. at 153. There simply is no conflict in their testimony on this point. Furthermore, consistent with Winter's testimony, both Diane Jackson and Tammy Ruffing testified that Gaitros could not definitively say when they would be recalled. Even Rose Priddy, who testified that Gaitros told her she would be recalled, indicated that Gaitros could not give a specific date.

---

_____

### DISSENT

_____

R. GUY COLE, JR., Circuit Judge, dissenting. Because I believe the majority rejects out of hand factual findings of the Board that are supported by substantial evidence, and substitutes its own factual conclusions instead, I respectfully dissent.

### I.  STANDARD OF REVIEW

It has long been established that we must uphold the Board's factual findings if they are supported by substantial evidence on the record as a whole. *See* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951). As we noted in *NLRB v. Plainville Ready Mix Concrete*, 44 F.3d 1320 (6th Cir. 1995), "the facts and complexities of the bargaining process are 'particularly amenable to the expertise of the Board as factfinder,' and 'few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a Board [that] deals constantly with such problems.'" *Id.* at 1326 (quoting *Bolton-Emerson, Inc. v. NLRB*, 899 F.2d 104, 108 (1st Cir. 1990); *NLRB v. Hospitality Motor Inn, Inc.*, 667 F.2d 562, 563 (6th Cir. 1982)).

As the *Universal Camera* Court explained, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 340 U.S. at 477 (internal quotation marks omitted). While a reviewing court must consider "the record in its entirety . . ., including the body of evidence opposed to the Board's view," *id.* at 487-88, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

### III. CONCLUSION

For the foregoing reasons, we find that the NLRB's decision was not supported by substantial evidence; accordingly, enforcement of the order is **DENIED.**

merely express "a possibility more likely expressed to lend hope to the laid-off employee than to give a realistic assessment of his being recalled to work" and do not "without more, provide an adequate basis for concluding that an employee had a reasonable expectancy of recall." *Id.* at 1174.

The dissent acknowledges the principle articulated in *Sol-Jack*, 286 N.L.R.B. at 1174, and later adopted by the Sixth Circuit in *Ideal Macaroni*, 989 F.2d at 881, that equivocal statements made by an employer about the likelihood of recall are not controlling if the "surrounding objective facts" do not support a reasonable expectation of recall. The dissent attempts to distinguish the case at bar from *Sol-Jack* on the basis that the employer in *Sol-Jack* disavowed his previous statements regarding the possibility that the company would recall the laid-off employees; whereas, here, the employer made no such disavowal. This is a distinction without significance in light of this Court's decision in *Ideal Macaroni* where the employer did not disavow statements regarding the possibility of recall. The Court, nonetheless, discounted the significance of the employer's expressed anticipation of recall because the "surrounding objective facts" did not support a reasonable expectation of recall. 989 F.2d at 881. In the case at bar, the objective circumstances surrounding the layoffs, i.e., the declining sales, building inventory, eroding customer base, and increasing automation do not support a reasonable expectation of recall. Accordingly, equivocal statements by the vice-president of Seawin suggesting the possibility of recall do not "provide an

---

Tr. at 117. At bottom, the testimony of the laid-off workers establishes, without exception, that Gaitros was "vague as to when . . . the employees were to be recalled." *Ideal Macaroni*, 989 F.2d at 881. Because there is no conflict in the testimony of the various witnesses on this point, we reach this conclusion without intruding upon the Hearing Officer's prerogative to resolve questions of fact when there is a conflict in the testimony. *Cf. Health Care and Retirement Corporation of America v. NLRB*, No. 99-5604, 2000 WL 1140554 at *4 (6th Cir. Aug. 3, 2000) (unpublished) ("It is the Board's function to resolve questions of fact and credibility *when there is* a *conflict in the testimony*.") (emphasis added).

adequate basis for concluding that an employee had a reasonable expectancy of recall." *Sol-Jack,* at 1174.

### 3.    Future Plans of the Employer

The Hearing Officer stated that "[r]egarding the future plans of the employer, no evidence was presented or adduced to show that there was any fundamental change in the nature or scope of the Respondent's business such as might suggest that the employee herein had no reasonable expectation of recall." J.A. at 92. For the same reasons articulated above, the Hearing Officer's conclusion is plainly refuted by the record. Seawin presented uncontested evidence that, shortly after the layoffs, it significantly increased automation and subcontracted to have automated equipment built.

The Hearing Officer also notes that Seawin has a tax abatement agreement with the city of Fremont, Ohio which provides that if Seawin does not maintain a workforce of at least fifty-four employees, it will lose its tax abatement incentives. The Hearing Officer infers from the tax abatement agreement that Seawin intends to stay in the city of Fremont, Ohio. Of course, that is a reasonable inference; however, nothing in the tax abatement agreement requires Seawin to recall the eleven laid-off employees. In fact, the record clearly indicates that several months after the layoffs, Seawin's full-time employment roster was near the level required to achieve exact compliance with the tax abatement agreement. Furthermore, there were sixty-seven full time employees before the layoffs and fifty employees after the layoffs. The real question upon which the eligibility of the eleven laid-off employees turns is whether there was  "a reasonable expectancy that in the near future that number" fifty  would rise to sixty-one, "or at least move a substantial distance in that direction." *Zatko Metal Products*, 173 N.L.R.B. at 33. The record unequivocally indicates that the number of people employed by Seawin has remained constant since the layoffs. Indeed, the Hearing Officer acknowledged that the five laid-off employees who were recalled (2-3 months after the election) were rehired merely to fill positions created by the

natural attrition of employees.  Clearly, "[e]xpectancy of employment . . . does  not concern itself with the chances of normal, or even extraordinary attrition, which might decimate the remaining group and fortuitously create openings that old workmen could fill." *Zatko Metal Products*, 173 N.L.R.B. at 33. The fact that Seawin maintained an employment roster of fifty employees in the months following the  layoffs is significant in light of Mark Winter's testimony that Seawin was able to improve its efficiency at that post-layoff employment level.  Thus, the record reflects that the need for the labor intensive services of the eleven laid-off production workers had not increased in the months following the layoffs.

The Hearing Officer also concluded that there is evidence that Seawin is expanding its production operations. Contrary to the Hearing Officer's finding, there is no evidence in the record to support the conclusion that Seawin is expanding its production operations. Presumably, the Hearing Officer was relying on the tax abatement agreement that the city of Fremont granted as a result of Seawin's decision to expand the square footage of its facility.  However, the Hearing Officer failed to note  that  the tax abatement agreement was signed in September 1997,  during a time when  Seawin's inventory was increasing at a rapid rate and when it was building products in excess of demand. In light of these undisputed inefficiencies, it is clear that the purpose of the agreement was not to allow Seawin to produce more, but rather to allow it warehouse more of its inventory.[6]  In any case, there is no evidence in the record to support the Hearing Officer's conclusion that Seawin was expanding its production operations.

---

[6]The only testimony on point was provided by the vice-president of Seawin, Charles Gaitros. Gaitros stated that the purpose of the addition to Seawin's facility was to "give us more room" for  inventory. Tr. at 15.