IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 95-60708

———————————————

HUGHES CHRISTENSEN COMPANY,

Petitioner-Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

———————————————

Petition for Review and Cross-Petition for Enforcement of an
Order of the
National Labor Relations Board

———————————————

Before KING and HIGGINBOTHAM, Circuit Judges, and KAZEN*, District
Judge.

HIGGINBOTHAM, Circuit Judge:

This case presents the question of when a laid-off worker has

a reasonable expectation of recall in the foreseeable future and is

therefore eligible to vote in a union referendum. On September 29,

1995, the National Labor Relations Board ordered the Hughes

Christensen Company to recognize and bargain with the United

Steelworkers of America (the Union). That order resulted from the

NLRB's determination that the Union was properly certified because

eleven challenged voters who had been laid off prior to the

_____

*U.S. District Judge from the Southern District of Texas,
sitting by designation.

election were eligible to vote because they had a reasonable expectation of reemployment in the foreseeable future. Hughes petitioned for review of the NLRB's decision regarding the challenged voters, and the NLRB cross-appealed for enforcement of its order. We find that the NLRB lacked substantial evidence on the record to find that the challenged employees had a reasonable expectation of recall and therefore deny enforcement of the NLRB's order.

I.

Before 1992, the Hughes Christensen Company manufactured drill bits for the oil and gas industry out of a plant on Polk Street in Houston. On June 24, 1991, however, Hughes announced its plans to relocate operations to Woodlands, Texas, a municipality about 35 miles from Houston. The Union represented 260 steelworkers at the Polk Street plant. Because of its modern design and automated equipment, the Woodlands plant required only 150 of the Polk Street steelworkers.

In the spring and summer of 1992, Hughes bargained with the Union over the method for selecting employees for the new facility and the effects of the Polk Street closure on those employees not selected. The Union expressed concern that none of the current steelworkers would be selected for employment at Woodlands. In response, Hughes stated that the "initial staffing" of Woodlands would be drawn from Polk Street employees and that the phase-down

2

of operations at Polk Street would be concluded by November 1, 1992.

During bargaining, Hughes agreed to sign a letter drafted by the Union to solicit retraining and skills training funds jointly under the Job Training Partnership Act. The letter stated that the new facility required fewer people and therefore Hughes was faced with the task of "permanently laying off many long-term and loyal employees." Hughes also proposed a severance package for non-selected employees, which gave departing employees twelve weeks pay, as opposed to the two weeks pay they received in past layoffs. Receipt of the severance package was conditioned on the employee signing a waiver of the right to recall.[1] In its final proposal Hughes offered to "consider for recall" any non-selected employees who had not, in the interim, signed this waiver.

The Union never accepted Hughes' final proposal, and Hughes proceeded on its own, selecting employees for the Woodlands plant based on merit, without regard for seniority. By early August 1992, Hughes had evaluated every employee, made its selections, and communicated its decisions to all the steelworkers. Beginning

---

[1]The waiver reads, in pertinent part: "I, [name], waive and release all rights and claims, charges and demands and causes of action against Hughes Christensen Company . . . of any kind [or] character, both past and present, known or unknown, including those arising under the Age Discrimination in Employment Act of 1967, as amended, and any other state or federal statute, regulation or the common law (contract, tort or other), which relate to my employment or alleged discriminatory employment practices. I understand that this Agreement shall not serve to waive or release any rights or claims that may arise after the date this Agreement is executed."

3

August 14, a predesignated group of steelworkers was laid off every week until December 23.

On October 30, 1992, the Union held an election to determine whether the Woodlands steelworkers would be represented. The election resulted in a vote of 91 for continued representation by the Union and 94 against, with 17 challenged votes. Hughes challenged 17 votes on the grounds that they were cast by employees laid off on October 23 who had no reasonable expectation of employment with Hughes in the foreseeable future. A hearing on these challenged ballots was held before an Administrative Law Judge, who validated 11 of the challenged votes.[2]

At the hearing, the ALJ heard testimony from Fred Mabry, the Union staff representative who led the bargaining team during the negotiations with Hughes. Mabry testified that the Union understood the permanent nature of the layoffs. He also stated that he spoke to the steelworkers and told them that their chance of recall for work at Woodlands was "pretty slim."

The laid-off workers themselves testified that they were aware of the company's plans to permanently downsize. However, they each had reasons why they thought they would be recalled. Most

---

[2]The Union did not dispute Hughes' challenges to 5 of the 17 voters, so the ALJ found that they did not have a reasonable expectation of recall. The ALJ also found that one voter, Bruce Lum, understood on the day of his layoff that he would not be recalled. The ALJ found that 10 of the remaining 11 voters had a reasonable expectation of reemployment and that the eleventh, C.C. Richardson, had been laid off for discriminatory reasons and should therefore be considered an eligible voter.

testified that they had been laid off and called back in the past and therefore thought they had a chance of recall during this layoff. However, the laid-off workers acknowledged that this layoff was different from previous layoffs because it resulted from downsizing, not changing market conditions. Most also mentioned that a manager or supervisor made encouraging remarks about the possibility of recall. One testified that he thought he would be recalled after Hughes changed its plans and added the machines he worked on to the Woodlands plant. None of them signed the waiver form prior to voting in the election.

The ALJ found that Hughes, because of the cyclical nature of its business, frequently laid off and rehired its workers. She also found that Hughes initially understaffed the Woodlands plant and that this was communicated to each challenged voter by Hughes managers.[3] Most of the challenged voters had been laid off before, and the ALJ found that this past experience, coupled with the information about inadequate staffing at Woodlands, gave the challenged voters a "reasonable expectation of recall in the foreseeable future."

In reviewing the ALJ's findings, the NLRB noted that she improperly discussed the individual workers' subjective

---

[3]As evidence of Hughes' intent to recall laid-off workers, the ALJ pointed to its use of the phrase "initial staffing" in negotiations with the Union. She also relied on Hughes' later recall of laid-off workers as evidence that the company initially understaffed.

expectations of recall.  However, the NLRB found that she also identified objective factors the employees could have relied upon in anticipating recall and that therefore the totality of her analysis sufficed to support her conclusion.[4]

## II.

A laid-off employee is eligible to vote if, at the time of the election, the employee had a reasonable expectation of re-employment in the foreseeable future.  Birmingham Ornamental Iron Co. v. NLRB, 615 F.2d 661, 664 (5th Cir. 1980).  Whether a worker has a reasonable expectation of recall is determined by looking to three factors:  1)  the employer's past experience; 2) the employer's future plans; and 3) the circumstances of layoff, including what employees were told about the likelihood of recall. Apex Paper Box, 302 NLRB 67, 68 (1991).  A reasonable expectation of recall is required to ensure that the voting employee is "sufficiently concerned with the terms and conditions of employment in a unit to warrant his participation in the selection of a collective bargaining agent."  Shoreline Enterprises v. NLRB, 262 F.2d 933, 944 (5th Cir. 1959).  There must be more than a mere possibility of recall to allow a laid-off worker to cast a vote.

---

[4]The NLRB did overturn the ALJ's determination that one of the voters, C.C. Richardson, was eligible to vote because of his status as a discriminatee under § 8(a)(3) of the National Labor Relations Act.  The NLRB upheld Richardson's vote, however, because it independently found that Richardson had a reasonable expectation of recall.  The NLRB adopted the ALJ's findings in affirming her holding that the other workers reasonably expected to be recalled and therefore this opinion discusses the ALJ's findings.

The ALJ found that Hughes had rehired laid-off workers in the past, but she stated that these previous layoffs were caused by the rise and fall of demand for drill bits. The record contains no objective evidence that a rise in demand for drill bits was imminent. Furthermore, the ALJ acknowledged that the 1992 layoff was caused by the physical move of the manufacturing operations to a smaller plant with new machinery that reduced the need for many of the steelworkers. Unlike layoffs prompted by the ebb and flow of the business cycle, this layoff contained an amount of certainty: the Woodlands plant could accommodate fewer employees.

The NLRB contends that even if we assume that this layoff was different in type from previous ones, Hughes made no effort to communicate this difference to its workers. However, this contention ignores the fact that the laid-off employees testified that they understood that this layoff was different because it was prompted by the company's move to a smaller plant. Many of the workers stated that they heard the layoffs characterized as permanent by Union representatives, or answered in the affirmative when asked whether they knew the layoffs were meant to be permanent.

In determining that Hughes intended to rehire laid-off employees in the future, the ALJ relied upon Hughes' statement that they would use Polk Street employees for the "initial staffing" of Woodlands. The ALJ was persuaded that this created an expectation of further staffing in the future. However, in context, the phrase

7

"initial staffing" is not amenable to this interpretation. In response to Union concerns that none of the Polk Street staff would be transferred, Hughes assured them that they would hire Polk Street employees for the initial staffing of the Woodlands plant. This meant that the first group of employees sent to Woodlands would be drawn from the Polk Street employees but that Polk Street employees would have no priority for future job openings.

The circumstances of this layoff also should have alerted the workers to its permanent nature. Hughes departed from previous layoff procedures by giving employees twelve weeks severance pay, as opposed to the two weeks given in previous layoffs. Perhaps the most persuasive evidence of the permanent nature of the layoffs is the testimony of Union representative Fred Mabry. Mabry testified that he spoke at workers' meetings and told them that the chances of recall were "pretty slim."

The ALJ disregarded this evidence and instead relied on the worker's testimony that many of them were told by managers that the new plant was understaffed and that Hughes would probably be hiring more workers. The testimony of these workers is understandable; many of them had put in over twenty years with Hughes and wanted to believe that their time with the company was not over. However, vague statements by an employer about the possibility of future employment are not sufficient to support a finding of a reasonable expectation of employment. See Sol-Jack Co., 286 NLRB 113 (1987)(finding that where company clearly had not rebounded from

8

the financial condition that caused the layoff, the employer's suggestion that the employee "might be back to work" was insufficient to find a reasonable expectation of recall).

The ALJ also cited no evidence as to when the Polk Street workers expected to be recalled. The standard for counting a laid-off employee's vote anticipates that the employee expects to be recalled at a time in the foreseeable future. Significantly, Hughes never gave the laid-off Polk Street workers any information about when, if ever, future staffing would occur.

As we find that the NLRB's decision was not supported by substantial evidence, enforcement of the order is DENIED.