**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 16 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WEBCO INDUSTRIES, INC.,

    Petitioner and Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

    Respondent and Cross-Petitioner.

---

UNITED STEELWORKERS OF AMERICA

    Intervenor.

Nos. 01-9532 & 01-9533

NLRB
(No. 17-CA-19898)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, Circuit Judge, **McWILLIAMS**, and **BRORBY**, Senior Circuit Judges.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Webco Industries, Inc. appeals a decision of the National Labor Relations Board (Board) finding it violated § 8(a)(1)[1] and (a)(3)[2] of the National Labor Relations Act (Act)[3]; the Board cross-appeals for enforcement, and the United Steel Workers of America (Union) intervenes in support of the Board. Exercising jurisdiction under 29 U.S.C. § 160(e) and (f) (2002), we grant the Board's cross-application for enforcement.

The issues presented are: (1) whether substantial evidence supports the findings of the alleged violations; (2) whether Bryan O'Connell was a supervisor and therefore barred from relief under the Act; (3) whether Eric Martin is barred from relief because he signed a severance agreement releasing Webco from claims under the Act; and (4) whether relief for Bryan O'Connell and Charlie Williams is

---

[1] Section 8(a)(1) of the National Labor Relations Act corresponds to 29 U.S.C. § 158(a)(1) (2002), which provides: "It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the Act] . . . ." 29 U.S.C. §157 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

[2] Section 8(a)(3) of the National Labor Relations Act corresponds to 29 U.S.C. § 158(a)(3), which provides: "It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

[3] 29 U.S.C. §§ 151-169.

time barred under § 10(b)[4] of the Act.

*Nature of the Case*

On October 8, 1998, the Union filed an unfair labor practices charge with the Board's regional director against Webco alleging, *inter alia*, violation of § 8(a)(1) and (a)(3) of the Act, stemming from the discharge[5] of a number of employees in alleged retaliation for Union activity. Based on these charges, later amended, the Board's general counsel, by the acting regional director, filed a complaint, later amended, against Webco.

After conducting a hearing on the amended complaint, an administrative law judge issued a decision on September 17, 1999, sustaining certain charges, dismissing others and recommending remedial relief. By Decision and Order dated July 19, 2001, the Board found Webco violated § 8(a)(1)[6] and (a)(3)[7] of the

---

[4] Section 10(b) of the National Labor Relations Act corresponds to 29 U.S.C. § 160(b). It provides: "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . . Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon."

[5] While one of the employees (Robert Leasman) was discharged during his probationary term, Webco characterizes the other employees as having been "laid off." However, in light of Webco's own policy that laid-off employees could never again apply for employment with the company, the event is properly described as a discharge. For purposes of this proceeding, the two terms are interchangeable.

[6] Webco interfered with the § 7 [29 U.S.C. § 157] rights of Messrs. Schooley, O'Connell, Rogers, and Morris through coercive interrogation about

Act and issued an order of relief.

***Standard of Review***

"The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e); *see* 29 U.S.C. § 160(f). In measuring substantiality, we weigh the whole record, including evidence leading to inferences contrary to Board findings. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488 (1951). However, we will not "negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." *Id.* Nor will we "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* Substantial evidence denotes "not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder." *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.,* 522 U.S. 359, 377 (1998) (emphasis in the

Union activities, implied threat of reprisal for exercise of rights to organize and interference with rights to solicit Union support.

[7] Webco discharged Messrs. Schooley, O'Connell, Rogers, Morris, Wilson, Teague, Leasman, Martin, Ruckman, and Williams in retaliation for Union support.

-4-

original); *see N.L.R.B. v. Wilhow Corp.,* 666 F.2d 1294, 1299 (10th Cir. 1981).

Credibility and weight determinations belong to the Board, *Wilhow Corp.* at 1299-

1300, and we will not set them aside "absent extraordinary circumstances."

*Medite of New Mexico, Inc. v. N.L.R.B.,* 72 F.3d 780, 792 (10th Cir. 1995). As to

the Board's legal conclusions, "[i]n reviewing the NLRB's interpretation of the

NLRA, we recognize that Congress made a conscious decision to continue its

delegation to the Board of the primary responsibility of marking out the scope of

the statutory language . . . ." *Colorado-Ute Elec. Ass'n, Inc. v. N.L.R.B.,* 939

F.2d 1392, 1400 (10th Cir. 1991) (quotations and citations omitted), *cert. denied*

*sub nom.*, 504 U.S. 955 (1992). While we accord great deference to legal rulings

of the Board, we "must reject administrative constructions which are contrary to

clear congressional intent." *N.L.R.B. v. Oklahoma Fixture Co.,* 295 F.3d 1143,

1145 (10th Cir. 2002), *enf. granted*, 332 F.3d 1284(2003) (quoting *Chevron*

*U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984), *reh'g*

*denied*, 468 U.S. 1227(1984)).

### *Background*

Webco Industries, Inc. is a manufacturer and distributor of specialty steel

tubing. Its largest facility, Southwest Tube, is located in Sand Springs,

Oklahoma. On October 7, 1998, due to a precipitous market decline, conceded by

the Board's general counsel and the Union, Webco laid off fifty-three of its 273

employees at the Southwest Tube facility. The Union contended the ten alleged

discriminatees were selected for discharge because of their Union sympathies and

activities. Webco denied the allegation and showed that employees without

Union sympathies, including supervisory personnel, were also laid off, and

employees with Union sympathies were retained. But history informs the debate.

The Union tried to organize the Southwest Tube facility beginning in early

1997. In connection with that campaign, Webco was charged with unfair labor

practices.[8] The campaign was suspended in April of 1997, but resumed on

August 19, 1998,[9] with handbilling[10] just outside the Southwest Tube facility by

Union organizer Jim Teague. Supervisor Ted Dye, who observed the handbilling,

testified his presence was intended to ward off any anti-Union misbehavior. Of

the ten alleged discriminatees, eight of them (Messrs. Morris, Rogers, Schooley,

Wilson, Martin, Ruckman, O'Connell and Williams) were active in both the 1997

and 1998 Union organizing efforts, and six served on an in-house organizing

committee (Messrs. Morris, Rogers, Schooley, Wilson, Ruckman and O'Connell).

Richard Teague was not employed by Webco at the time of the 1997 effort, but

---

[8] *See Webco Indus., Inc. v. N.L.R.B.,* 217 F.3d 1306 (10th Cir. 2000) (upholding NLRB decision finding Webco violated § 8(a)(1) and (a)(3) of the Act).

[9] Unless otherwise indicated, all date references are to 1998.

[10] The handbill announced a Union organizing meeting that evening.

took a handbill from Jim Teague and attended the Union meeting on August 19, 1998. Robert Leasman was a probationary employee with Webco who began employment in the latter part of July 1998. He also took a flyer from Jim Teague on August 19 and attended the Union meeting that evening. Unlike the others, all of whom were laid off on October 7, he was discharged without explanation on August 24. Richard Teague was a brother of Union organizer Jim Teague, and Gary Schooley and Robert Leasman were related to Jim Teague by marriage.

Webco management testified as to the process for selecting the fifty three employees laid off on October 7. In late September, founder and chief executive officer Bill Weber and his daughter, chief operating officer Dana Weber, informed Ms. Robin Robinette, human resources director, that facility reorganization and layoffs were necessary to meet a declining market. Ms. Robinette took charge of the effort to thin the labor force, assisted by Messrs. Tom Lewis, Don Holder, and Doug Jackson of senior management. The Webers offered broad guidance to this group, declaring attitude to be the number one factor in determining which employees would be kept and which let go. Attitude was described as a willingness to be flexible in job assignments, do whatever needed to be done, and be a team player. Senior management reviewed personnel files, discussed the matter, and prepared the initial list of employees to be released. In the days leading up to the first lay-offs on October 7, middle

managers were invited into the process and given an opportunity to remove names from the release list.

Five former members of Webco middle management testified at the hearing (Messrs. Whittenburg, O'Brien, Cash, Nance, and Krevett). Each of them claimed senior Webco management exhibited anti-union animus.[11] All except Mr. Whittenburg (who left Webco in 1996) testified that active Union activity was a reason for placing an employee on the October 7 discharge list. According to the collective testimony of these managers, at the final meetings to firm up the layoff list, all ten of the alleged discriminatees were variously mentioned as pro-Union and in need of discharge (Mr. Leasman had already been discharged on August 24). At these meetings, Ms. Robinette wondered aloud how Richard Teague and Robert Leasman were ever hired, since they were both related to Union organizer Jim Teague. Members of senior management described Richard Teague and Robert Leasman as "union plants." At a meeting on October 7, some managers defended employees who had been placed on the layoff list. Chief executive

---

[11]As the administrative law judge put it, "[T]he witnesses are generally independent and mutually corroborating and despite certain unlikely aspects . . . I believe their testimony. In so finding, I have considered that each could have a motive to fabricate. But when taken together there is just too much evidence to disbelieve." (R. Vol. IV, Decision of Administrative Law Judge, at 20.)

officer Mr. Bill Weber told the assembled group their jobs were on the line for any name they removed from the list.

### Was O'Connell a Supervisor or an Employee?

Webco argues it did not violate § 8(a)(1) and (a)(3) of the Act with respect to Bryan O'Connell because he was a supervisor and not an employee. The Act excludes supervisors[12] from its protection. The employer carries the burden of proving an individual is a supervisor. *N.L.R.B. v. Kentucky River Cmty. Care, Inc.,* 532 U.S. 706, 712 (2001). "Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions [*see* n.12], (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer." *Id.* at 713 (quotations and citations omitted). One nominally a supervisor may not enjoy his exempt status under the Act because the degree of independent judgment exercised is measurably

---

[12]"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

"The term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . ." 29 U.S.C. § 152(3).

circumscribed by the employer. "It falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies" to separate an employee from a supervisor. *Id.* "It was the Senate's [prevailing] view [during enactment of 29 U.S.C. § 152(11)] that employees such as 'straw bosses,' who had only minor supervisory duties, should be included within the Act's protections." *N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.,* 416 U.S. 267, 281 (1974). We accord great weight to a Board determination of supervisory status "since the gradations of authority responsibly to direct the work of others . . . are so infinite and subtle . . . ." *N.L.R.B. v. Dixon Indus., Inc.,* 700 F.2d 595, 598 (10th Cir. 1983) (quotations and citations omitted).

Mr. O'Connell, one of twelve trainers at the plant, was responsible for training in the cold draw department. His immediate supervisor was shift business manager Mark McIllwain. Mr. O'Connell spent about half his time training new employees on equipment, and the other half of his time he operated a machine on the shop floor or ran errands for his supervisor. He also trained veteran employees shifting from one piece of equipment to another. He exercised judgment in how to train an employee. He initialed time cards. He had the authority to send an employee home sick if Mr. McIllwain was absent. He critiqued employees on how well they were doing their jobs and offered input on whether an employee would advance from one pay level to another. He could

offer a recommendation on whether to keep a probationary employee, but he could not make the decision. He assisted in the employee evaluation process, although all employees participated in a team evaluation effort. On occasion, he signed employee evaluations. He signed reprimands of other employees about three times at the instruction of his supervisor, and after his supervisor had asked him to investigate the situation. He attended management meetings representing his department on perhaps three occasions in place of his supervisor. These meetings concerned safety and production. When his supervisor was absent, which occurred about four times, he was in charge of the department. He was paid an hourly wage that exceeded the highest wage in the department by about twenty-five cents per hour.

Mr. Nance, general business manager of the cold draw department and McIllwain's superior, testified it was rare for a trainer to fill in for his immediate supervisor because company policy directed a shift business manager be on duty at all times. According to Mr. Nance, when a trainer was not training he was usually operating a machine on the shop floor. He considered a trainer a lead person with no authority to hire or issue disciplinary action, although he might sign a disciplinary form along with his shift business manager and the general business manager. Actual discipline was approved by management only. According to his testimony, the purpose of a trainer "was pretty strictly to keep

-11-

the work and production flowing and teach people how to run machines and that sort of thing." (R. Vol. I at 289).

Notwithstanding the testimony from Mr. O'Connell and Mr. Nance, Ms. Robinette testified trainer responsibilities were in writing, and Mr. O'Connell spent all of his time training, which included training on company policies and procedures. Mr. O'Connell denied having been shown the written responsibilities of trainers, and he denied training on company policies and procedures. Ms. Robinette claimed Mr. O'Connell had the authority to initiate disciplinary action and to suspend other employees. She added he wore a supervisor's uniform and parked in a management parking lot for which he needed a special pass.

From this litany of job descriptors, Webco argues Mr. O'Connell had the responsibility to direct, evaluate, discipline and suspend other employees, and in so doing he exercised independent judgment. The Board concluded Webco failed to prove supervisory status for Mr. O'Connell, and the record supports its decision. Missing in Webco's case is a direct link between Mr. O'Connell's exercise of his job responsibilities and company decisions "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees." 29 U.S.C. § 152(11). The Board concluded Mr. O'Connell was an insignificant player in company decisions affecting other employees. His participation was at most ministerial and attenuated, as in signing reprimand slips

at the instruction of his supervisor.  Adopting the reasoning of the Board, we agree Mr. O'Connell performed only the kinds of "minor supervisory duties" envisaged by legislative history as insufficient to establish supervisory status. *Bell Aerospace,* 416 U.S. at 281.

### *Martin Severance Agreement*

Webco next contends it did not violate § 8(a)(1) and (a)(3) of the Act with respect to Eric Martin because he signed a severance agreement providing for the payment to him of $569.40 (less usual withholdings) in exchange, *inter alia*, for his promise not to file a complaint with the Board concerning his discharge and his release of Webco from all employment-related claims.  Mr. Martin signed the agreement when he was discharged on October 7, without taking the opportunity Webco gave him to discuss it with an attorney or Union officials.  On October 8, the Union filed its first charge against Webco, not naming Mr. Martin as an alleged discriminatee.  He was so named in the first amended charge filed by the Union on December 29.  The Board's acting regional director issued a complaint on March 8, 1999.  Neither the Board's general counsel nor the Union had notice of the agreement when it was signed, and both objected to giving it effect.  The Board, in a divided opinion, upheld the administrative law judge's decision finding the severance agreement did not bar relief for Mr. Martin under the Act.

In *Independent Stave Co, Inc.*, employees on whose behalf unfair labor

-13-

practices were filed reached private, non-Board settlement agreements with the

employer, approved by their union, and requested withdrawal of charges.

*Independent Stave Co, Inc.,* 287 N.L.R.B. 740 (1987).  The Board's general

counsel objected, relying on Board precedent which suggested a private

settlement agreement should be rejected if it does not mirror the complete remedy

which the alleged discriminatees might achieve on all charges in a concluded

unfair labor practice proceeding.  The Board noted its "power to prevent unfair

labor practices is exclusive, and that its function is to be performed in the public

interest and not in vindication of private rights and the Board alone is vested with

lawful discretion to determine whether a proceeding, when once instituted, may

be abandoned." *Id.* at 741 (quotations and citations omitted).  The Board then

revised its test for evaluating whether to give effect to private, non-Board

settlement agreements:

> [I]n order to assess whether the purposes and policies underlying the Act would be effectuated by our approving the agreement, the Board will examine all the surrounding circumstances including, but not limited to, (1) whether the charging party(ies), the respondent(s), and any of the individual discriminatee(s) have agreed to be bound, and the position taken by the General Counsel regarding the settlement; (2) whether the settlement is reasonable in light of the nature of the violations alleged, the risks inherent in litigation, and the stage of the litigation; (3) whether there has been any fraud, coercion, or duress by any of the parties in reaching the settlement; and (4) whether the respondent has engaged in a history of violations of the Act or has breached previous settlement

agreements resolving unfair labor practice disputes.

*Id.* at 743. In giving effect to the agreements, the Board noted the settlement terms were reasonable and respondent had no history of violating the Act. *Id.*

Again, in *Hughes Christensen,* the validity of private settlement agreements was before the Board. In September and October 1992, the union filed charges based on the non-selection of certain employees for transfer to a new company facility. *Hughes Christensen Co.,* 317 N.L.R.B. 633, 634 (1995), *enf. denied on other grounds*, 101 F.3d 28 (5th Cir. 1996). In November, the Board's regional director dismissed the charges, and the union appealed. *Id*. While appeal of the dismissal was pending, three employees signed private settlement agreements. *Id*. In April 1993, the appeal was sustained and the charges reinstated. Both the union and the general counsel opposed giving effect to the severance agreements, although there was no contention they were fraudulent. *Id.* Nevertheless, applying the *Independent Stave* test, the Board enforced the agreements. The Board specifically stated the agreements were "a reasonable adjustment in light of the potential costs and risks inherent in any litigation." *Id.* Further, the Board emphasized the company "does not have a history of violating the Act . . . ." *Id.*

Here, the administrative law judge examined all of the surrounding circumstances, applied the *Independent Stave* test and declined to give effect to

Mr. Martin's private settlement agreement. As in *Hughes Christensen*, the Union and general counsel opposed the settlement agreement and there was no contention it was fraudulent. The administrative law judge, however, distinguished *Hughes Christensen*, particularly noting the respondent's history of prior violation of the Act. As to the agreement's reasonableness, he further distinguished *Hughes Christensen* on the grounds the Martin severance agreement was executed before charges were filed, suggesting it was thus impossible for the judge to evaluate its reasonableness "in light of the nature of the violations alleged, the risks inherent in litigation, and the stage of litigation." *Independent Stave Co, Inc.,* 287 N.L.R.B. at 743. A majority of the Board adopted the administrative law judge's reasoning, and so do we. We are particularly compelled to this conclusion by consideration of the responsibility of the Board to effectuate the purposes of the Act, an exercise to which we accord great deference. *Oklahoma Fixture,* 295 F.3d at 1145. While we concur in the principle of just settlement of claims, in this instance the Board's refusal to give effect to the Martin severance agreement came after an examination of the totality of the circumstances and a reasoned application of the *Independent Stave* test; it is thus a lawful exercise of Board discretion with which we will not interfere.

*Sec. 8(a)(1) Violations*

### *Gary Schooley*

Mr. Schooley was a draw bench operator before being discharged on October 7. He was active in both the 1997 and 1998 Union campaigns. Jim Teague, the Union organizer, was his brother-in-law. On September 7, a few weeks after the Union renewed its campaign to organize Webco, supervisor Jene Harmon called Mr. Schooley at home and asked him how Union activities were going. Mr. Schooley claimed not to know, stating he was trying to stay out of it and "lay low." (R. Vol. I at 361). This was false, by Mr. Schooley's own testimony, since he was at the very time trying to convince other employees to sign Union cards and attend meetings.

### *Bryan O'Connell*

Mr. O'Connell was also active in both the 1997 and 1998 Union organizing campaigns. He offered unrefuted testimony that on September 7 his supervisor, Mr. McIllwain, called him at home, and informed him his own superior, Mr. Nance, had called to say Mr. O'Connell had been discussing the Union with other employees. Mr. O'Connell denied this to Mr. McIllwain. Later that week, Mr. McIllwain approached Mr. O'Connell on the shop floor, and asked him if he was talking Union again. He told Mr. O'Connell that Larry O'Brien, quality assurance manager, had informed him Mr. O'Connell had been discussing the Union with

Jerry Rogers at break time. Mr. O'Connell denied this, although he had discussed Union issues with Mr. Rogers on previous occasions. Mr. McIllwain then told Mr. O'Connell that Mr. O'Brien had told him to "keep an eye on" him.

### Jerry Rogers and Roy Morris

Messrs. Rogers and Morris, both Union activists in the 1997 and 1998 campaigns, were employed as quality assurance auditors under the direct supervision of Charlie Conn. Both were laid off on October 7, while the third quality assurance auditor was retained in a restructured position. Messrs. Rogers and Morris worked in an area of the plant described as the tensile room, which also doubled as an informal break room. An official break room was across the hall. According to each of them, on September 18, Mr. Conn came into the tensile room and locked the door behind him. He informed them that while it was acceptable to take their breaks in the tensile room, Union talk was only appropriate on break time and in the official break room across the hall. Mr. Conn himself took occasional lunch breaks with Messrs. Rogers and Morris in the tensile room, where they discussed family and recreational matters. He asked Mr. Rogers if he was still serious about getting the Union into the plant. They discussed Union activities and then other subjects.[13]

---

[13]Webco suggests Mr. Rogers initiated the conversation, and argues the Act is not violated when an employee who is an avowed union supporter initiates discussion of the union with the employer. However, the record indicates Mr.

*Analysis*

The Board found the interrogation of Mr. Schooley and Mr. Rogers to be coercive, that of Mr. O'Connell to constitute an intent by management to surveil in order to discourage Union activities, and that of Messrs. Rogers and Morris to be an attempt to restrain Union discussion on break time in a de facto break room, while permitting discussion of other subjects in the same room, all in violation of § 8(a)(1) of the Act. We agree.

Webco cites to *Rossmore House,* 269 N.L.R.B. 1176 (1984), *aff'd sub nom. Hotel Employees & Restaurant Employees Union, Local 11 v. N.L.R.B.,* 760 F.2d 1006 (9th Cir. 1985), for the proposition that employer-initiated questioning of an avowed union supporter concerning union activities does not violate § 8(a)(1) of the Act. However, the holding was fact specific. To determine whether questioning violates the Act, we consider "whether under all of the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act . . . . [E]ither the words themselves or the context in which they are used must suggest an element of coercion or interference." *Rossmore House*, 269 N.L.R.B. at 1177 (citation and footnote omitted); *accord, Presbyterian/St. Luke's Med. Ctr. v. N.L.R.B.*, 723 F.2d 1468, 1475 (10th Cir.

Conn led Mr. Rogers into the Union discussion, and thus supports the administrative law judge's finding of coercive interrogation.

-19-

1983).  "A violation is established if the questions asked, when viewed and interpreted as the employee must have understood the questioning and its ramifications, could reasonably coerce or intimidate the employee with regard to union activities." *Presbyterian/St. Luke's*, 273 F2d at 1475 (quotations and citation omitted).

It is uncontested Messrs. Schooley, O'Connell and Rogers were avowed Union supporters.  The fact that Mr. Harmon called Mr. Schooley at his home and inquired about Union activities, and the fact that Mr. Schooley felt a need to falsely deny his Union involvement evidences a context suggesting coercion.  The same is true of the questioning of Mr. Rogers, prefaced by his supervisor locking the door of the tensile room.  The merits of the alleged violation concerning Mr. O'Connell are perhaps the most convincing.  He was questioned about his Union activities during a telephone call to his home and once on the job site, and he was informed management was going to "keep an eye" on him.  Webco's recent history of unfair labor practices provides additional coercive context to each of these conversations. With good reason, Webco offers no defense in its brief to the allegation of attempting to ban Union discussion from a de facto break room during break time.  Bearing in mind "a reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship," *N.L.R.B. v. Gissel Packing*

*Co.,* 395 U.S. 575, 620 (1969), we uphold the Board's findings of the listed §

8(a)(1) violations.

### Sec. 8(a)(3) Violations

The Board upheld the administrative law judge's findings that in

discharging Mr. Leasman and in laying off Messrs. Morris, Rogers, Schooley,

Wilson, Teague, Martin, Ruckman, O'Connell, and Williams, Webco violated §

8(a)(1) and (a)(3) of the Act.[14]

### Analysis

In an unfair termination action under the Act, "the General Counsel need

show by a preponderance of the evidence only that a discharge is in any way

motivated by a desire to frustrate union activity . . . ." *N.L.R.B. v. Transportation*

*Mgmt. Corp.,* 462 U.S. 393, 399 (1983). However, "proof that the discharge

would have occurred in any event and for valid reasons amount[s] to an

affirmative defense on which the employer carrie[s] the burden of proof by a

preponderance of the evidence." *Id.* at 400. The employer "does not violate the

NLRA . . . if any anti-union animus that he might have entertained did not

contribute at all to an otherwise lawful discharge for good cause." *Id.* at 398.

The Board concluded the general counsel had established its case, and Webco had

---

[14]"Although § 8(a)(1) and(a)(3) are not coterminous, a violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1)." *Metropolitan Edison Co. v. N.L.R.B.,* 460 U.S. 693, 698 n.4 (1983).

failed to establish its affirmative defense. We agree.

The record is replete with evidence of Webco's anti-union animus in the face of two successive Union organizing campaigns in 1997 and 1998, evidenced in particular by the damning testimony of its former executives, the prior unfair labor practice charges relative to the 1997 campaign, and the course of conduct leading to the § 8(a)(1) violations discussed above. All of the persons discharged were known Union activists, except Messrs. Leasman and Richard Teague, who were known relatives of Union organizer Jim Teague. Webco personnel monitored Union handbilling on August 19, 1998, the kick-off to the new organizing campaign. At this time, Messrs. Leasman and Richard Teague took handbills from Union organizer Jim Teague.

While Webco offered no explanation for the discharge of probationary employee Robert Leasman, it explained the discharge of the remaining nine alleged discriminatees was due to plant restructuring, a review of their personnel files and an evaluation of their attitude. The administrative law judge offered this concerning the personnel records upon which Webco relied:

> The fact is for even the worst alleged discriminatee, certain sections support General Counsel's theory; for even the best alleged discriminatee, certain sections support Respondent's theory. Those employees among the 53 laid off, who are not claimed to be alleged discriminatees also had records which could be argued from either side. For good measure, my attention is also called to those employees not laid off who in some cases

had equally inconsistent records.  The result of this tidal wave of reports, evaluations, reviews, and the disciplinary write-ups is in my opinion, inconclusive.

*Webco Indus.*, 334 N.L.R.B. 77 at 30, 2001 WL 831622(2001) (quoting *Webco Indus.,* 1999 WL33454714 (Sept. 17, 1999) (citation omitted)).

As well, each of the nine employees discharged in at least partial reliance upon alleged poor personnel records testified no explanation was given for their discharge other than poor market conditions requiring downsizing. This was the company response even when two employees specifically asked if their discharge was due to anything in their work record.  When Mr. O'Connell challenged supervisor Mr. Nance about the reason for his layoff, Mr. Nance offered the stock economic justification and added, "sometimes when people hear things, they hold a grudge." (R. Vol. I at 579).  When Mr. Wilson asked why he was being discharged, a company supervisor told him it was due to economic conditions and his name was "pulled . . . out of a hat."  (R. Vol. I at 603).  As to "bad attitude," the Board relied on its own precedent and characterized this terminology as a codeword for union sympathizer.  *See Highland Yarn Mills, Inc.,* 313 N.L.R.B. 193, 211 (1993).

On the sum of the evidence, and after an exhaustive review of the record, we believe the Board had a substantial basis for finding Webco employed the opportunity provided by a legitimate economic layoff to rid itself of persons it

regarded as actual or potential troublesome Union activists, by blending them in with the discharge of other employees who had no demonstrated Union sympathies, and, in fact, by retaining some employees who may have had quiescent Union leanings. Despite Webco's efforts to camouflage its intent, the Board correctly found the general counsel met its burden of establishing unlawful termination of the ten alleged discriminatees, and Webco failed to establish its affirmative defense of legitimate discharge.

*§10(b) of the Act*

Webco contends § 10(b) of the Act bars relief for Messrs. O'Connell and Williams because their names were added to the action by way of an amended charge, dated April 30, 1999, which was filed more than six months after the alleged unfair labor practices at issue. However, the same practices that gave rise to the timely filed charges gave rise to the amended charges.

The Board allowed the amendment by relying on its enunciated procedure in *Redd-I, Inc.*: "[W]e would not find the amendment barred under Section 10(b) . . . because the discharge occurred within 6 months of a timely filed charge and the alleged violation appears to be closely related to the allegations of that charge." 290 N.L.R.B. 1115 (1988). To determine whether a charge is "closely related" to a timely filed charge, the Board examines (1) whether the untimely charges concern the same legal theory as the timely charge, (2) whether they arise

from the "same factual situation or sequence of events," and (3) whether the respondent would raise the "same or similar defenses." *Id.* at 1118; *see also, Facet Enterprise, Inc. v. N.L.R.B.,* 907 F.2d 963, 979 (10th Cir. 1990) (allowing amendment alleging an unfair labor practice closely related to a timely filed charge).

We defer to the Board's authority to construe provisions of the Act, *Oklahoma Fixture,* 295 F.3d at 1145, agree with the Board's application of its test to the facts of this case, and conclude § 10(b) of the Act does not bar relief for Messrs. O'Connell and Williams.

*Conclusion*

We conclude the Board at all times acted within its authority, and substantial evidence supports its findings. Therefore, we **GRANT** enforcement of the Board's order and **DENY** Webco's petition for review.

**Entered by the Court:**

**TERRENCE L. O'BRIEN**
United States Circuit Judge